**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | |
|---|---|
| IN RE: | ) |
| | ) **Case No.** |
| **MOREHEAD MEMORIAL HOSPITAL,** | ) |
| | ) **Chapter 11** |
| Debtor. | ) |
| | ) |

**MOTION TO EMPLOY HAMMOND HANLON CAMP LLC AS INVESTMENT
BANKER AND OPERATIONAL AND STRATEGIC ADVISOR TO THE DEBTOR**

Morehead Memorial Hospital, as debtor and debtor-in-possession (collectively, "Morehead" or the "Debtor"), hereby moves for entry of an Order pursuant to Sections 327(a) and 328(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the employment of Hammond Hanlon Camp LLC ("H2C") as investment banker and operational and strategic advisor to the Debtor effective as of the Petition Date.  In support of this Motion, the Debtor refers to and relies upon the Affidavit of Dana M. Weston in Support of First Day Motions (the "Weston Affidavit"), filed contemporaneously herewith, and respectfully represents as follows:

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this motion is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A).

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are Sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rules 2014 and 2016.

1

## FACTUAL BACKGROUND

4.     On July 10, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor continues in possession of its assets as debtor-in-possession.  No trustee, examiner, or official committee of unsecured creditors has been appointed to date.

5.     The Debtor is a North Carolina non-profit corporation that owns and operates a 108-bed general acute care community hospital (the "Hospital") in a 22-acre campus located at 117 East Kings Highway, Eden, North Carolina.  The Debtor also owns and operates a 121-bed skilled nursing facility (the "Nursing Center") located in the Hospital's campus, as well as several other separate medical office buildings not contiguous to the Hospital's campus.  The Debtor is controlled by an eleven-member board of trustees comprised of community leaders from Eden and Rockingham County (the "Board of Trustees").

6.     Founded in 1924, the Debtor is a two-state healthcare system that serves patients in a 12-zip code area encompassing Rockingham County, North Carolina and neighboring southern Virginia areas.  A cornerstone in Eden and one of the top five employers in Rockingham County, the Debtor employs approximately 700 individuals that provide comprehensive medical services to the more than 31,000 people who visit the Debtor's hospital on an annual basis.

7.     The Hospital is one of seven hospital facilities in their local market, serving a population of approximately 200,000 people.  The next closest hospital facility is located 11 miles away.  The Hospital's mission is to provide quality care, with a commitment to patient safety and clinical excellence.

8.     A detailed description of the Debtor's business and the facts precipitating the filing of the Debtor's Chapter 11 case is set forth in the Weston Affidavit in support of the Debtor's various First Day Motions. Those facts are incorporated herein by reference.

## RELIEF REQUESTED

9.     Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2016, the Debtor requests the Court enter an Order: (i) authorizing the employment and retention of H2C as investment banker and operational and strategic advisor to the Debtor pursuant to the terms and conditions of a restated engagement agreement dated July 10, 2017 (the "Engagement Agreement"); (ii) approving the terms of H2C's employment, including the proposed fee structure and indemnification provisions as may be modified by any Order of the Court, set forth in the Engagement Agreement; and (iii) granting such other and further relief as the Court deems appropriate. The Debtor requests that H2C's employment be deemed effective as of the Petition Date.

### A.    Selection of H2C

10.     After diligent analysis, it became apparent to the Board of Trustees that aligning with a strategic partner would give the Debtor the best chance to ensure that the Hospital would survive and thrive in the future.  In late 2013, the Board began to reach out to local health systems to identify the right partner for the Debtor.  After conversations with leadership at multiple systems, no hospital emerged as interested in acquiring a rural community hospital.

11.     In 2014, Novant Health, Inc. ("Novant Health") provided an offer to manage the Hospital, and the Board accepted, terminating the Debtor's affiliation agreement with the previous management company.  Novant Health was retained with the objective to reduce costs and expand clinical services.

12.     Though the Debtor has experienced a decrease in overall revenue, the Debtor has continued to make operational improvements since Novant Health took over management.  Those improvements include:

(a)  Reduced emergency department transfers through tracking and analysis of historical transfers;

(b)  Establishment of a dedicated team to improve patient satisfaction through tracking and analysis of nine key Hospital Consumer Assessment of Healthcare Providers and Systems domains;

(c)  Evaluated physician contracts to align with more productivity-driven incentives;

(d)  Increased efforts to strengthen community partnerships with agencies such as Rockingham County EMS, Rockingham County Health Alliance, Rockingham County Schools, and the Eden Chamber of Commerce;

(e)  Renegotiated ambulatory revenue cycle partnership with Parallon to focus on improving denials and incentive-based collection arrangement; and

(f)  Applied and obtained approval to participate in 340B drug pricing program for outpatient providers.

13.     Nonetheless, the Debtor's ongoing legacy costs, primarily related to pension funding and debt service, along with declining revenue, have had a debilitating effect on the Debtor's ability to restructure its finances.

14.     As the Debtor struggled with liquidity throughout 2016, the Board decided to engage consultants to start a formal search for a strategic affiliation with a larger healthcare provider. In February 2016, the Board engaged H2C for the purposes of (i) providing financial advisory services to the Debtor, including general business and financial analysis, (ii) identifying opportunities for a transaction involving the Nursing Center, (iii) advising the Hospital concerning opportunities for such a transaction, and (iv) as requested by the Debtor, participating on the Debtor's behalf in negotiations concerning such transaction. In August 2016, the Board expanded H2C's engagement to have H2C begin a formal search for strategic affiliation options for the

Debtor with other healthcare providers. Finally, in July 2017, the Board further expanded H2C's role and engaged Michael Lane, a Managing Director with H2C, to provide operational and strategic advisory services to the Debtor as it enters the Chapter 11 process. The terms of H2C's employment, including the proposed fee structure for investment banking services and operational and strategic advisory services, are set forth in the Engagement Agreement, a copy of which is attached hereto as Exhibit A.

15.    H2C is now intimately familiar with the Debtor's financial affairs, debt structure, business operations, capital structure, key stakeholders, financing documents and related matters. H2C's pre-petition work for the Debtor has included, but has not been limited to: (a) reviewing and analyzing the Debtor's business, (b) reviewing and analyzing the Debtor's operations, (c) reviewing and analyzing the Debtor's financial projections, and (d) advising the Debtor in identifying key principles and primary objectives for a potential transaction.

16.    The Debtor believes that H2C has the experience, industry knowledge, and relationships necessary to identify the best possible strategic affiliation option for the Hospital. H2C is an independent, healthcare-focused investment banking and financial advisory firm with a particular emphasis on the not-for-profit sector. The firm traces its heritage back almost 30 years through its predecessor organizations, including Shattuck Hammond Partners. With offices in Atlanta, Chicago, New York and San Diego, H2C is uniquely positioned to help the Debtor meet its financial goals. The firm's principals and managing directors have been lead advisors on hundreds of transactions in the healthcare industry representing billions of dollars in value, offering the experience and industry knowledge to achieve the most favorable results for the Debtor's estate. H2C has assembled a team of senior professionals that have worked with leading health systems around the country and executed many of the most creative transactions in the

healthcare industry. The firm's leadership leverages more than 230 years of combined experience in the field of healthcare strategy and finance.

### B.   Services to be Rendered

#### i.   *Investment Banking Services*

17.   In accordance with the Engagement Agreement, at the request and direction of the Debtor, H2C will perform the following investment banking services to the extent they are desired or necessary:

(a)   Assist the Board of Trustees in developing a set of key principles and primary objectives for a potential transaction, including but not limited to such transaction terms as transaction structure, form of consideration, liabilities to be assumed, governance rights, mission and service level commitments, repurchase/unwind options, post-transaction business plan requirements, physician retention/recruitment, management and employee matters.

(b)   Develop an estimate of fair market value of the Debtor's assets as a going concern, under current market conditions.

(c)   Assist the Debtor in assembling summary descriptive and financial information to be shared with potential partners upon the execution of confidentiality agreements and prior to the submission of indications of interest ("IOI").

(d)   Assist in the preparation of a confidential information memorandum ("CIM") concerning the Debtor, which memorandum shall not be made available to or used in discussions with prospective partners until both it and its use for that purpose have been approved by the Debtor.

(e)   In conjunction with the Debtor, develop a transmittal letter to accompany the CIM, including key points related to a potential transaction and information to be submitted in the IOI.

(f)   Develop, update and review with the Debtor on an ongoing basis a list of parties which might be interested in partnering with the Debtor (the "List") and only contact parties on the List as approved by the Debtor.

(g)    Advise the Debtor as to strategy and tactics in connection with its negotiation of a potential transaction (the "Transaction").

(h)     Make initial inquiries on behalf of, and only as directed by, the Debtor with potential partners to determine their initial level of interest in a transaction.

(i)     In anticipation of receiving IOIs, assist the Debtor in the following:

  i.     the management of the due diligence process, including maintaining an electronic due diligence data room, attending and supervising due diligence sessions, and supervising the document production process; and

  ii.    developing materials and preparing for a presentation to prospective partners that highlights the Company's strengths and the investment opportunity.

(j)     Analyze and review with the Debtor all indications of interest and, based upon these responses, assist the Debtor in deciding whether and with which potential partner(s) to negotiate a letter of intent or definitive agreement.

(k)     Attend and facilitate meetings between the Debtor and potential partners.

(l)     Assist the Debtor in the negotiation of transaction documents.

(m)     Assist in performing reverse due diligence on the prospective partner(s) and in confirmatory due diligence processes concurrent with negotiation of transaction documents.

(n)     Render such other financial advisory and investment banking services as may specifically, from time-to-time, be agreed upon by H2C and the Debtor in writing.

### ii.     *Operational and Strategic Advisory Services*

18.    In addition, in accordance with the Engagement Agreement, H2C will provide the services of Michael Lane, a Managing Director of H2C, to advise and assist the Board of Trustees and the Debtor's executive management team with the following tasks:

(a)     Assist management in developing strategies to improve cash flow and reduce expenses.

(b)     Assist management in identifying and implementing both short-term and long-term liquidity generating initiatives.

(c)     Assist management in the implementation of its business plan.

7

(d)     Assist management in reporting to its secured lenders.

(e)     Assist management in complying with budgets.

(f)     Assist management in negotiating, amending or terminating leases and contracts.

(g)     Assist management in communications, reporting, and negotiations with creditor constituencies including an unsecured creditor's committee, vendors or other parties in interest

(h)     Assist management in weekly review and oversight of cash management.

(i)     Assist management with capital expenditures and operating projections.

(j)     Coordinate the Hospital's efforts to identify a suitable operating partner.

(k)     Presentation and attendance in person or by phone at periodic Board meetings.

(l)     Oversight of any filings in the chapter 11 bankruptcy case, including review of any DIP financing required in such Chapter 11 bankruptcy case.

(m)     Assist management and the Hospital's legal counsel in negotiations with the U.S. Department of Housing and Urban Development ("HUD"), Berkadia Commercial Mortgage LLC, the official committee of unsecured creditors or any other significant creditors, vendors or other parties in interest in the Chapter 11 bankruptcy case.

(n)     Assist management and the Hospital's legal counsel in the development and implementation of a Chapter 11 plan of reorganization.

(o)     Assist management and the Hospital's legal counsel in areas such as testimony before the United States Bankruptcy Court, including preparation for and attendance at the Section 341 Meeting of Creditors.

(p)     Oversight of the working group of professionals working on restructuring matters on behalf of the Hospital, including legal counsel.

(q)     Assist with such other matters that may arise during the Chapter 11 proceeding as requested by the Board or the Chief Executive Officer.

19.     The services that H2C will provide to the Debtor are necessary to enable the Debtor to maximize the value of its estate.  The services of H2C will complement, and not duplicate, the

services rendered by any other professional retained in this case. H2C understands that the Debtor has retained and may retain additional professionals during the term of the engagement, and H2C agrees to work cooperatively with such professionals to coordinate the work conducted by the Debtor's professionals in order to avoid any unnecessary duplication of services.

20.     Specifically, the Debtor does not believe that the services of H2C and Grant Thornton LLP ("Grant Thornton") (who the Debtor separately seeks to retain as their financial consultant) will materially overlap, in that H2C's efforts, as described above, will be focused on tasks related to a transaction, as well as operational and strategic assistance to the Debtor's Board and executive management team, while Grant Thornton's engagement will largely involve assisting the Debtor with financial matters related to this bankruptcy case, including cash management and planning, assessment of liquidity, preparation of budgets, financial statements, monthly operating reports, and any other financial disclosures required by the Court.

21.     H2C has prepared the affidavit of Michael Lane (the "Lane Affidavit") disclosing the information relevant to this Motion pursuant to Bankruptcy Rules 2014 and 2016, a copy of which is attached hereto as Exhibit B.

### C.    Compensation

22.     The proposed compensation structure (the "Compensation Structure") for H2C's services will be bifurcated between H2C's investment banking services to the Debtor (which will be paid a transaction fee, rather than on an hourly basis, plus reasonable and necessary out-of-pocket business expenses) and Michael Lane's operational and strategic advisory services to the Debtor (which will be paid as a fixed monthly fee of $50,000 per month, plus reasonable and necessary out-of-pocket business expenses).

23.    The Debtor seeks approval of H2C's Compensation Structure pursuant to Bankruptcy Code Section 328(a), which provides, in relevant part, that a Debtor, "with the court's approval, may employ or authorize the employment of a professional person under section 327 [. . .] on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis [. . . ]." 11 U.S.C. § 328(a).

### i.    *Investment Banking Services*

24.    Subject to the Court's approval, and as described in the Engagement Agreement, the Debtor requests that H2C be entitled to receive the following as compensation for its investment banking services on behalf of the Debtor:

(a)    A retainer of $100,000, which was paid to H2C on August 10, 2016 (the "Retainer").

(b)    In the event of a negotiated or competitive sell-side process of the Hospital alone or the Hospital and Nursing Center combined, a success fee of 1.5% of the total consideration earned, due and payable in cash at the closing of the transaction. The success fee shall be contingent upon closing and in addition to the Retainer described in (a) above.

(c)    In the event of a separate negotiated or competitive sell-side process of the Nursing Center alone, a minimum Nursing Center success fee of $250,000 earned, due and payable at the closing of the Nursing Center transaction. In the event that the total consideration for the Nursing Center exceeds $8,000,000, an additional Nursing Center success fee of 5.0% of the total consideration earned, due and payable at the closing of the Nursing Center transaction. This Nursing Center success fee shall be contingent upon closing and paid in addition to the Retainer and the success fee in paragraph (b) above.

25.    Further, if a transaction occurs either (i) during the term of H2C's engagement under the Engagement Agreement, regardless of whether the party or parties to such transaction were identified by H2C or whether H2C rendered advised concerning such transaction, or (ii) at any time during the twelve (12) months following the effective date of termination or expiration

10

of H2C's engagement, and such transaction involves a party identified by H2C, then the Debtor shall pay the success fee to H2C.

26.     H2C intends to apply to the Court for allowance of compensation for professional services and reimbursement of necessary and reasonable out-of-pocket expenses incurred relating to the provision of investment banking services to the Debtor in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the orders and Local Rules of this Court.

27.     Because the Debtor is requesting that H2C be paid for its investment banking services through a transaction fee, rather than on an hourly basis, and because H2C's services would not be compensated by reference to the number of hours spent, the Debtor requests that H2C be permitted to maintain time records for investment banking services rendered for the Debtor in one-half hour time increments only, in lieu of submission by H2C of detailed billing statements that report time in tenth of an hour increments by project category.

28.     Further, the Debtor requests that any fee payable to H2C as a result of its investment banking services is only subject to the standards of review set forth in Bankruptcy Code Section 328(a), and not subject to the standards of review set forth in Bankruptcy Code Section 330, whereby the right to raise any challenges to fees pursuant to Section 330 of the Bankruptcy Code is only reserved by the Court and the Bankruptcy Administrator's Office.  The Debtor submits that H2C's proposed Compensation Structure for its investment banking services, as described in the Engagement Agreement, should be approved unless H2C's fees "prove to have been improvident in light of developments not capable of being anticipated at the time" such compensation structure was initially approved.  11 U.S.C. § 328(a).

29.     As described more fully in the Lane Affidavit in support of the Motion, the fee structure for H2C's investment banking services is similar to the terms, both financial and otherwise, agreed to by H2C and other investment banking and financial advisory firms, both inside and outside of bankruptcy, for transactions of similar size and scope. The fee structure was negotiated between the Debtor and H2C and reflects the extensive work to be performed by H2C in this case and H2C's expertise.

### ii.      *Operational and Strategic Advisory Services*

30.     Subject to the Court's approval, and as described in the Engagement Agreement, the Debtor requests that H2C be entitled to receive the following as compensation for Michael Lane's operational and strategic advisory services on behalf of the Debtor:

(a)     A monthly fixed fee of $50,000 per month (the "<u>Monthly Fee</u>") plus reasonable out-of-pocket expenses for the services of Michael Lane.

31.     H2C intends to apply to the Court for allowance of compensation for professional services and reimbursement of necessary and reasonable out-of-pocket expenses incurred relating to the provision of operational and strategic advisory services to the Debtor by Michael Lane in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the orders and Local Rules of this Court.

32.     H2C has agreed to accept as compensation for Mr. Lane such sums as may be allowed by the Court on the basis of the professional time spent, the rates charged for such services, the necessity of such services to the administration of the estate, the reasonableness of the time within which the services were performed in relation to the results achieved, and the complexity, importance, and nature of the problems, issues, or tasks addressed in the case.  Mr. Lane has agreed to maintain detailed time records for his services in tenth of an hour increments.

33.     The fee structure for H2C's operational and strategic advisory services is consistent with, and typical of, compensation arrangements entered into by H2C and other comparable firms when rendering similar services under similar circumstances.  Moreover, given the numerous issues which H2C may be required to address in the performance of its services, H2C's commitment to the variable level of time and effort necessary to address such issues as they arise, and the market prices for such services for engagements of this nature in an out-of-court context, as well as in Chapter 11, the Debtor submits that the fee arrangement agreed upon in the Engagement Agreement is reasonable under these circumstances.

34.     H2C was not paid a retainer for the operational and strategic advisory services to be rendered as described herein and in the Engagement Agreement.

35.     Other than as set forth herein, no arrangement is proposed between the Debtor and H2C for compensation to be paid in this case. In light of the above, the Debtor submits that such proposed Compensation Structure is fair and reasonable and should be approved under Bankruptcy Code Section 328(a).

**D.     Indemnification**

36.     Subject to Court approval and pursuant to the terms of the Engagement Agreement, in connection with H2C's engagement to provide investment banking and operational and strategic advisory services to the Debtor, the Debtor has agreed to indemnify and hold harmless H2C while acting as an advisor the Debtor to the extent and in the manner provided in the Engagement Agreement.

**E.     Disinterestedness of Professionals**

37.     To the best of the Debtor's knowledge, information and belief, based on and except as set forth in the Lane Affidavit, H2C does not hold or represent any interest adverse to the Debtor,

its creditors, or other parties-in-interest in connection with the Debtor and this Chapter 11 case, and is a "disinterested person" as that term is defined by Bankruptcy Code Section 101(14), as modified by Bankruptcy Code Section 1107(b).  More specifically, as set forth in the Lane Affidavit, H2C, its partners and employees:

> (a)    are not creditors, equity security holders or insiders of the Debtor;
>
> (b)    are not and were not, within 2 years before the date of the filing of the Debtor's Chapter 11 petitions, directors, officers, or employees of the Debtor; and
>
> (c)    do not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor, or for any other reason.

38.    Based on and as set forth in the Lane Affidavit, H2C informed the Debtor that H2C has assessed, and will continue to assess, any and all client relationships to ensure that H2C does not represent any interests adverse to the Debtor, its creditors or other parties-in-interest and that no disqualifying circumstances exist, and further, that H2C shall disclose on an ongoing basis any relationship that may reflect upon H2C's disinterestedness.  The Debtor understands that to the extent H2C discovers any additional facts bearing upon matters described herein or its engagement by the Debtor during the period of its employment, H2C will promptly disclose such facts and supplement the information contained in this Motion and the Lane Affidavit.

39.    H2C has not been retained to assist any entity or person other than the Debtor on matters relating to, or in connection with, the Debtor and its Chapter 11 case.  If this Court approves the proposed retention and employment of H2C by the Debtor, H2C will not accept any engagement or perform any service for any entity or person other than the Debtor related to this Chapter 11 case.  H2C will, however, continue to provide professional services to, and engage in commercial or professional relationships with, entities or persons that may be creditors of the

Debtor or parties-in-interest in this Chapter 11 case; *provided, however*, that such services do not relate to, or have any connection with, the Debtor and this Chapter 11 case.

40.    The Debtor has been advised that H2C will not share any compensation to be paid on behalf of the Debtor in connection with services to be performed with any other person or entity, other than other professionals of H2C, to the extent required by Bankruptcy Code Section 504

## CONCLUSION

WHEREFORE, the Debtor requests that this Court enter an Order (i) authorizing the employment and retention of H2C as investment banker and operational and strategic advisor to the Debtor pursuant to the terms and conditions of the Engagement Agreement, effective as of the Petition Date; (ii) approving the terms of H2C's employment, including the proposed Compensation Structure and indemnification provisions as may be modified by any Order of the Court, set forth in the Engagement Agreement; and (iii) granting such other and further relief as the Court deems appropriate.

Respectfully submitted, this the 10th day of July, 2017.

**WALDREP LLP**

/s/ *Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
Jennifer B. Lyday (NC Bar No. 39871)
Francisco T. Morales (NC Bar No. 43079)
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104
Telephone: 336-717-1440
Telefax: 336-717-1340
Email: notice@waldrepllp.com

*Proposed Attorneys for the Debtor*

# EXHIBIT A



ATLANTA    CHICAGO    NEW YORK    SAN DIEGO

4655 Executive Drive, *Suite 280*
San Diego, CA 92121

h2c.com
T 858 242 4800

July 10, 2017

W. Eugene Russell
Chairman of the Board
Morehead Memorial Hospital
117 East Kings Highway
Eden, NC 27288

Re:    Restated Engagement Agreement between Morehead Memorial Hospital and Hammond Hanlon Camp LLC dated July 10, 2017

Dear Mr. Russell:

WHEREAS, on February 10, 2016, the Board of Trustees (the "Board") of Morehead Memorial Hospital (the "Hospital") engaged Hammond Hanlon Camp LLC ("H2C") (together with the Hospital, the "Parties") for the purposes of (i) providing financial advisory services to the Hospital, including general business and financial analysis, (ii) identifying opportunities for a transaction involving Morehead Nursing Center (the "Nursing Center"), (iii) advising the Hospital concerning opportunities for such a transaction, and (iv) as requested by the Hospital, participating on the Hospital's behalf in negotiations concerning such transaction (the "Initial Engagement Agreement");

WHEREAS, on August 10, 2016, the Parties agreed to expand the Initial Engagement to have H2C begin a formal search for strategic affiliation options for the Hospital with other healthcare providers and to provide such other financial advisory and investment banking services as may be agreed upon by the Parties in writing (the "Revised Engagement Agreement");

WHEREAS, on April 21, 2017, the Parties executed a First Amendment to the Revised Engagement Agreement and agreed that H2C shall provide additional services for the Hospital in connection with a potential bankruptcy proceeding, including providing testimony concerning the Hospital's activity in seeking potential strategic affiliations and assisting the Hospital in identifying sources of debtor-in-possession financing (the "First Amendment");

WHEREAS, on July 5, 2017, the Parties executed a Second Amendment to the Revised Engagement Agreement and agreed that H2C shall provide additional strategic advisory and operational services to the Hospital in conjunction with the Hospital's planned Chapter 11 bankruptcy proceeding (the "Second Amendment"); and

WHEREAS, the Parties desire to enter into this agreement (the "Restated Engagement Agreement") to clarify and confirm their understanding and agreement with respect to the services to be provided by H2C to the Hospital as it enters the Chapter 11 restructuring process.

NOW, THEREFORE, the Parties agree as follows:

1.  <u>Purpose of Restated Agreement</u>.  The Restated Agreement supersedes the Initial Engagement Agreement, the Revised Engagement Agreement, the First Amendment, and the Second Amendment (collectively, the "Prior Agreements").  The Parties acknowledge and agree that the Prior Agreements are rendered null and void and shall no longer remain in full force and effect.   The Parties acknowledge and agree that their entire understanding with respect to the services to be provided to the Hospital by H2C are contained within the terms of this Restated Agreement.

2.  <u>Engagement and Scope of Services</u>.  H2C's services to the Hospital will be bifurcated into two separate roles: (i) investment banking services to the Hospital, and (ii) operational and strategic advisory services to the Hospital.

3.  <u>Investment Banking Services</u>. The Hospital has engaged H2C as its exclusive investment banker with respect to the Hospital's evaluation of strategic options that are the subject of this Restated Engagement Agreement.  The services outlined below are those H2C would expect to be necessary in order to satisfy the Hospital's goals and objectives for the strategic partnership process. Throughout all phases of the engagement, H2C would expect to work closely with representatives of the Hospital.

   3.1     <u>Strategic Partnership/Affiliation</u>

   a.     Assist the Board in developing a set of key principles and primary objectives for a potential transaction, including but not limited to such transaction terms as transaction structure, form of consideration, liabilities to be assumed, governance rights, mission and service level commitments, repurchase/unwind options, post-transaction business plan requirements, physician retention/recruitment, management and employee matters.

   b.     Develop an estimate of fair market value of the Company as a going concern, under current market conditions.

   c.     Assist the Company in assembling summary descriptive and financial information to be shared with potential partners upon the execution of confidentiality agreements and prior to the submission of indications of interest ("IOI").

   d.     Assist in the preparation of a confidential information memorandum ("CIM") concerning the Company, which memorandum shall not be made available to or used in discussions with prospective partners until both it and its use for that purpose have been approved by the Company.

   e.     In conjunction with the Company, develop a transmittal letter to accompany the CIM, including key points related to a potential transaction and information to be submitted in the IOI.

   f.     Develop, update and review with the Company on an ongoing basis a list of parties which might be interested in partnering with the Company (the "List") and only contact parties on the List as approved by the Company.

g.  Advise the Company as to strategy and tactics in connection with its negotiation of a potential Transaction.

h.  Make initial inquiries on behalf of, and only as directed by, the Company with potential partners to determine their initial level of interest in a transaction.

i.  In anticipation of receiving IOIs, assist the Company in the following:

 i.  the management of the due diligence process, including maintaining an electronic due diligence data room, attending and supervising due diligence sessions, and supervising the document production process; and

 ii.  developing materials and preparing for a presentation to prospective partners that highlights the Company's strengths and the investment opportunity.

j.  Analyze and review with the Company all indications of interest and, based upon these responses, assist the Company in deciding whether and with which potential partner(s) to negotiate a letter of intent or definitive agreement.

k.  Attend and facilitate meetings between the Company and potential partners.

l.  Assist the Company in the negotiation of transaction documents.

m.  Assist in performing reverse due diligence on the prospective partner(s) and in confirmatory due diligence processes concurrent with negotiation of transaction documents.

n.  Render such other financial advisory and investment banking services as may specifically, from time-to-time, be agreed upon by H2C and the Company in writing.

o.  The services described in this Restated Engagement Agreement will be performed generally in accordance with the timeline attached hereto and incorporated herein.

3.2  Additional Investment Banking Services Unrelated to Debtor-in-Possession ("DIP") Financing

a.  Should the Company enter into a Transaction while in bankruptcy, it will need to have such proposal submitted to a very broad audience of potential competing bidders with such audience to include those potential bidders which were originally solicited by H2C and to also include many additional potential bidders which shall not be limited to potential bidders currently involved in the ownership, management or operation of hospitals.  H2C agrees to assist the Hospital in this process.

b.  In addition, H2C will provide testimony in the Hospital's bankruptcy proceeding concerning its activity in seeking potential purchasers for the Hospital and submissions to potential bidders, and such other testimony (e.g., the general market for hospitals of the type of the Hospital, etc.) as is required by the Hospital's bankruptcy counsel for the bankruptcy proceeding.

c.  H2C shall also provide such other incidental services as are required for the Hospital to pursue successful completion of its bankruptcy proceeding and Transaction associated with the Hospital.

3.3   Additional Investment Banking Services Related to DIP Financing

  a.   In the event that the Hospital is unable to obtain DIP financing from one of its current creditors (e.g., U.S. Department of Housing and Urban Development, Berkadia Commercial Mortgage LLC, the Pension Benefit Guarantee Corporation), then, but only upon the request of the Hospital in writing, H2C will seek alternative (i.e., alternatives to the potential sources of DIP Financing identified in this Section 3.3(a)) for the Hospital during the bankruptcy proceeding.

3.4   Definitions.  The following terms used throughout Section 3 shall have the meanings set forth herein below:

  a.   The "Company" shall mean the Hospital and the Nursing Center.

  b.   A "Transaction" shall mean any transaction or series or combination of transactions other than in the ordinary course of business, whereby, directly or indirectly, control of, or a material interest in (greater than 50%), the Company or a material amount (greater than 50%) of the Company's assets, is transferred for Consideration, including, without limitation, by means of a:

    i.   Sale or exchange of assets or membership interests,

    ii.   A merger, member substitution or consolidation,

    iii.   The formation of a joint venture or partnership, or

    iv.   Any similar transaction.

  Without limiting the foregoing, any transaction or series or combination of transactions, that (i) results in the Person(s) controlling the Company immediately prior to such transaction not controlling the Company following such transaction, (ii) results in a change in the corporate membership of the Company, or (iii) the entry of the Company into a joint operating agreement or similar arrangement under which the Company's governance is substantially subject to a board of directors or similar body that it does not control, shall represent a "Transaction" for the purposes of this Restated Agreement. For purposes of this Restated Agreement, Persons shall mean an association, a corporation, a limited liability company, an individual, a partnership, a limited liability partnership, a trust or any other entity or organization, including the parties hereto.

  c.   Except as provided in subparagraph 3.4(d), "Consideration" shall mean:

    i.   "Asset Sale" - In the case of a Transaction involving the sale of assets, the total fair market value, at the time of closing, of all consideration paid or payable, or otherwise to be distributed (including the present value of any expected future earn out or other contingent payments), directly or indirectly, to the Company in connection with a Transaction (including, without limitation, the amount of all cash, securities and other non-cash Consideration paid, payable, issued or issuable by the purchaser and its affiliates, including, but not limited to, future capital expenditures, loans, contributions to foundations or similar entity, and extraordinary investments in operations), plus the fair market value of any indebtedness (including capital

leases), pension liability and other liabilities assumed, acquired, forgiven, repaid, retired, extinguished or otherwise borne by the purchaser or other third party in connection with a Transaction less all cash and cash equivalents held by the Company at closing.

ii.   "Member Substitution or Transfer" - In the case of a member substitution or membership transfer, Consideration shall include the amount of any financial commitments, including, but not limited to capital expenditures, loans, contributions to foundations or similar entity, and extraordinary investments in operations, made by the counterparty in connection with the Transaction, plus the fair market value of any indebtedness (including capital leases), pension liability and other liabilities assumed, acquired, forgiven, repaid, retired, extinguished or otherwise born by the purchaser or other third party in connection with a Transaction less all cash and cash equivalents held by the Company at closing.

iii.   "Joint Ventures and Related Partnership Transactions" - In the case of a joint venture, joint operating agreement, joint powers authority or other joint activity involving substantially all operations or other form of change in control which does not primarily involve an asset sale or member substitution or transfer transaction, Consideration shall be calculated as the fair market value of the business and assets contributed to the joint venture, joint operating company or joint powers authority, plus the amount of any future capital or capital expenditure commitments made by the counterparty in connection with the Transaction.

iv.   "Other Transactions" – In the case of a Transaction not described above, the parties will determine in good faith the Consideration paid.

For purposes of computing any fees payable to H2C hereunder, non-cash Consideration paid in the Transaction shall be valued as follows:

(x) publicly-traded securities shall be valued at the average of their closing prices (as reported on Bloomberg) for the five trading days prior to the closing of the Transaction and (y) any other non-cash Consideration shall be valued at the fair market value thereof, as determined by H2C acting reasonably and in accordance with customary market practices.

The value of "in-the-money" options and warrants shall be equal to the difference between the exercise price thereof and the value which would be received in the Transaction by a holder of the number and kind of securities into which such options and warrants are exercisable.

Any fee payable with respect to a Transaction involving the acquisition of 50% or more of the voting power of the Board will be computed as if 100% of the Company was acquired in such Transaction. If a Transaction involves the acquisition of less than 50% of the voting power of the Board, the fee payable to H2C shall be consistent with compensation arrangements customarily agreed to by H2C in similar circumstances and mutually agreed by the Parties.

If the Consideration is received in a series of Transactions, the Transaction Fee percentage applied to the Consideration shall be based on the cumulative of all Consideration received by the Company in each such Transaction.

d.  If a sale of the Company is structured in such a way so as to provide for the transfer of substantially all of the assets of the Company, any of its subsidiaries or any of their respective businesses but includes the retention of other assets of the Company or such business, as the case may be, including, but not limited to, cash, cash equivalents, investments, inventories and receivables, such retained assets shall nevertheless be deemed to be part of the Consideration received in connection with such sale of the Company or such business, as the case may be, as follows:  (i) with respect to investments, in an amount equal to the market value of such investments, (ii) with respect to inventories and receivables, in an amount equal to the book value thereof, and (iii) with respect to any other assets, in an amount to be reasonably determined by the Parties.

3.5  <u>Remuneration for Investment Banking Services and Additional Investment Banking Services Unrelated to DIP Financing</u>. As compensation for the services provided by H2C described under paragraphs 3.1 and 3.2, the Company shall pay H2C as follows:

a.  An Initial Retainer of $100,000, which was paid by the Hospital to H2C on August 10, 2016 concurrently with the execution of the Revised Engagement Agreement.

b.  In the event of a negotiated or competitive sell-side process of the Hospital alone or the Hospital and Nursing Center combined, a Success Fee of 1.5% of the total Consideration earned, due and payable in cash at the closing of the Transaction. This Success Fee shall be contingent upon closing and in addition to the Initial Retainer above.

c.  In the event of a separate negotiated or competitive sell-side process of the Nursing Center alone, a minimum Nursing Center Success Fee of $250,000 earned, due and payable at the closing of the Nursing Center Transaction. In the event that the total Consideration for the Nursing Center exceeds $8,000,000, an Additional Nursing Center Success Fee of 5.0% of the total Consideration earned, due and payable at the closing of the Nursing Center Transaction. This Nursing Center Success Fee shall be contingent upon closing and paid in addition to the Initial Retainer in subparagraph 3.5(a) and the Success Fee in subparagraph 3.5(b).

d.  If a Transaction occurs either:  (i) during the term of H2C's engagement hereunder, regardless of whether the party or parties to such Transaction were identified by H2C or whether H2C rendered advice concerning such Transaction, or (ii) at any time during a period of 12 months following the effective date of termination or expiration of H2C's engagement hereunder, and such Transaction involves a party named on the List, then the Company shall pay to H2C the Success Fee.

e.  Compensation which is payable to H2C pursuant to subparagraph 3.5(b) shall be paid in immediately available funds by the Company to H2C on the closing date of a sale of the Company; provided that compensation attributable to any part of Consideration which is contingent upon the occurrence of any future event shall be paid by the Company to H2C at the earlier of:  (i) the receipt by the Company or its equity holders, as applicable, of such Consideration and (ii) the time that the amount of such Consideration can be determined.

f.  Any other amounts as the Company and H2C shall mutually agree in writing.

g.  All fees and expenses payable hereunder are net of all applicable withholding and similar taxes and shall be paid in immediately available funds.

h.  The Company may refuse to discuss or negotiate a sale with any party for any reason whatsoever and may terminate negotiations with any party at any time.

3.6    <u>Remuneration for Additional Investment Banking Services Related to DIP Financing</u>. In the event that the Hospital requests H2C to obtain alternative DIP financing for the bankruptcy proceeding as stated in paragraph 3.3 and H2C successfully obtains such DIP financing, the Hospital shall pay H2C $100,000.

3.7    <u>Expenses Associated with the Provision of Investment Banking Services</u>. The Hospital agrees to reimburse H2C for any reasonable and necessary out of pocket business expenses incurred in connection with H2C's provision of Investment Banking Services to the Hospital. Reasonable expenses to be paid will be subject to the usual and customary approval of the United States Bankruptcy Court.

4.    <u>Operational and Strategic Advisory Services</u>.  H2C will provide the services of Michael Lane, Managing Director at H2C ("Mr. Lane"), as operational and strategic advisor to the Board and the Hospital's Chief Executive Officer with bankruptcy and restructuring matters during the Chapter 11 proceeding.  The services of Mr. Lane will be provided for up to six months (or, such longer time as H2C and the Hospital may agree). Mr. Lane shall report to the Board and Chief Executive Officer and be granted the requisite authority and approval deemed necessary by the Board and Chief Executive Officer to perform his duties.

4.1    <u>Description of Duties</u>. Mr. Lane's duties will be limited to the operational and strategic advisory services listed below:

- Assist management in developing strategies to improve cash flow and reduce expenses.

- Assist management in identifying and implementing both short-term and long-term liquidity generating initiatives.

- Assist management in the implementation of its business plan.

- Assist management in reporting to its secured lenders.

- Assist management in complying with budgets.

- Assist management in negotiating, amending or terminating leases and contracts.

- Assist management in communications, reporting, and negotiations with creditor constituencies including an unsecured creditor's committee, vendors or other parties in interest

- Assist management in weekly review and oversight of cash management.

- Assist management with capital expenditures and operating projections.

- Coordinate the Hospital's efforts to identify a suitable operating partner.

- Presentation and attendance in person or by phone at periodic Board meetings.

- Oversight of any filings in the chapter 11 bankruptcy case, including review of any DIP financing required in such Chapter 11 bankruptcy case.

- Assist management and the Hospital's legal counsel in negotiations with the U.S. Department of Housing and Urban Development ("HUD"), Berkadia Commercial Mortgage LLC, the official committee of unsecured creditors or any other significant creditors, vendors or other parties in interest in the Chapter 11 bankruptcy case.

- Assist management and the Hospital's legal counsel in the development and implementation of a Chapter 11 plan of reorganization.

- Assist management and the Hospital's legal counsel in areas such as testimony before the United States Bankruptcy Court, including preparation for and attendance at the Section 341 Meeting of Creditors.

- Oversight of the working group of professionals working on restructuring matters on behalf of the Hospital, including legal counsel.

- Assist with such other matters that may arise during the Chapter 11 proceeding as requested by the Board or the Chief Executive Officer.

4.2    <u>Remuneration for Operational and Strategic Advisory Services</u>. As compensation for the services to be provided by Mr. Lane under paragraph 4.1, the Hospital agrees to pay to H2C a monthly fixed fee of $50,000 per month (the "Monthly Fee") plus reasonable and necessary out of pocket business expenses incurred in connection with H2C's provision of Operational and Strategic Advisory Services. The Monthly Fee and reasonable expenses to be paid are subject to the usual and customary approval of the United States Bankruptcy Court. Travel expenses will be kept to a minimum and only incurred as necessary when traveling to the Hospital or attending court proceedings.  Given the nature of the services contemplated herein, it may not be necessary for Mr. Lane to be on site every week at the hospital.

5    <u>Miscellaneous</u>.

5.1    <u>Confidentiality and Non-Disclosure</u>.  The Company will furnish, or cause to be furnished, to H2C such information as H2C believes appropriate to its engagement hereunder (all such information, the "Information") and the Company represents that, to its knowledge, all such Information will be accurate and complete in all material respects.  In addition, the Company will furnish, or cause to be furnished, to H2C access to the Company's officers, directors, employees, accountants, counsel and representatives (collectively, the "Representatives") as H2C shall reasonably request.  It is specifically understood that H2C will rely solely upon the information supplied by the Company and its Representatives without assuming any responsibility for independent investigation or verification thereof.  The Company will notify H2C promptly of any material change in any Information previously made available to H2C by the Company that becomes known to the Company.

The Company agrees that all advice given by H2C in connection with its engagement hereunder is for the benefit and solely for the use of the management of the Company and that no such advice shall be used for any other purpose or be disclosed, reproduced, disseminated, quoted, summarized or referred to at any

time, in any manner or for any purpose, nor shall any public references to H2C be made by or on behalf of the Company without H2C's prior written consent.

Except as provided in this Restated Agreement, as required by law or as otherwise agreed to in writing by the Company, H2C agrees: (a) not to use the Information for any purpose other than in connection with H2C's engagement hereunder; (b) to disclose the Information only to those of its representatives with a bona fide need to know such information in connection with H2C's engagement hereunder; and (c) not to disclose to any person that is not one of H2C's representatives that the Company is considering strategic alternatives, the proposed terms and conditions thereof or any other facts related thereto.

5.2   <u>Independent Contractors</u>.  The Company agrees that H2C has been retained to act solely as investment banker and operational and strategic advisor to the Company, and not as an advisor to or agent of any other person, and that the Company's engagement of H2C is not intended to confer rights upon any person not a Party hereto (including equity holders, employees or creditors of the Company) as against H2C or its affiliates, or their directors, officers, employees or agents.  It is specifically understood that the Company's Board and management will not base its decisions regarding whether and how to pursue any transaction solely on H2C's advice, but will also consider the advice of the Company's legal, tax and other business advisors and such other factors which they consider appropriate.  H2C, as an independent contractor under this Restated Agreement, shall not assume the responsibilities of a fiduciary to the Company or its equity holders in connection with the performance of H2C's services hereunder.

5.3   <u>Indemnification</u>.  The Company shall:

   a.   indemnify H2C and hold it harmless against any and all losses, claims, damages or liabilities to which H2C may become subject arising in any manner out of or in connection with the rendering of services by H2C hereunder (including any services rendered prior to the date hereof) or the rendering of additional services by H2C as requested by the Company that are related to the services rendered hereunder, unless it is finally judicially determined that such losses, claims, damages or liabilities resulted from the bad faith, negligence or willful misconduct of H2C; and

   b.   reimburse H2C promptly for any legal or other expenses reasonably incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuits, investigations, claims or other proceedings arising in any manner out of or in connection with the rendering of services by H2C hereunder or the rendering of additional services by H2C as requested by the Company that are related to the services rendered hereunder (including, without limitation, in connection with the enforcement of this Restated Agreement and the indemnification obligations set forth herein); provided, however, that in the event a final judicial determination is made to the effect specified in subparagraph 5.3(a) above, H2C will remit to the Company any amounts reimbursed under this subparagraph 5.3(b).

The Company agrees that the indemnification and reimbursement commitments set forth in this paragraph 5.3 shall apply whether or not H2C is a formal party to any such lawsuits, investigations, claims or other proceedings and that such commitments shall extend upon the terms set forth in this paragraph 5.3 to any controlling person, affiliate, director, officer, employee or consultant of H2C (each, with H2C, an "Indemnified Person").  The Company further agrees that, without H2C's prior written consent, it will not enter into any

settlement of a lawsuit, claim or other proceeding arising out of the transactions contemplated by this Restated Agreement (whether or not H2C or any other Indemnified Person is an actual or potential party to such lawsuit, claim or proceeding) unless such settlement includes an explicit and unconditional release from the party bringing such lawsuit, claim or other proceeding of all Indemnified Persons.

The Company further agrees that the Indemnified Persons are entitled to retain separate counsel of their choice at a reasonable expense in connection with any of the matters in respect of which indemnification, reimbursement or contribution may be sought under this Restated Agreement in the event of a conflict preventing Company's counsel from also representing Indemnified Persons.

5.4   <u>Contribution</u>.  The Company and H2C agree that if any indemnification or reimbursement sought pursuant to the preceding paragraph 5.3 is judicially determined to be unavailable for a reason other than the bad faith, negligence or willful misconduct of H2C, then, whether or not H2C is the Indemnified Person, the Company and H2C shall contribute to the losses, claims, damages, liabilities and expenses for which such indemnification or reimbursement is held unavailable in such proportion as is appropriate to reflect not only the relative benefits received by H2C, on the one hand, and the Company, on the other hand, but also the relative degrees of fault of the Company, H2C and any other Indemnified Person, as well as any relevant equitable considerations; provided, however, that in no event shall the amount to be contributed by H2C pursuant to this paragraph 5.4 exceed the greater of $250,000 or the amount of the fees actually received by H2C hereunder.

5.5   <u>Public Announcements</u>.  The Company agrees that H2C has the right to place advertisements in financial and other newspapers and journals at its own expense describing its services to the Company hereunder with the Company's prior written consent.  Furthermore, the Company agrees that in any press release announcing a transaction as contemplated by this Restated Agreement or any amendment thereto, the Company will include in such press release a reference to H2C's role as financial advisor to the Company with respect to such transaction.

5.6   <u>Term; Termination</u>.

   5.6.1   <u>Investment Banking Services</u>. The term of H2C's investment banking engagement shall extend from the date hereof until terminated as set forth below.  Subject to the provisions of paragraphs 3.5 through 3.7, 5.1 through 5.5, and paragraphs 5.7 through 5.14, which shall survive any termination or expiration of this Restated Agreement (including by operation of the preceding sentence), either Party may terminate the investment banking services at any time by giving the other Party at least 10 days' prior written notice.  It being understood that any termination of the investment banking services for any reason shall not affect the Company's obligations to (i) pay to H2C fees accruing prior to such termination, (ii) provide indemnification pursuant to the terms of this Restated Agreement and (iii) reimburse expenses as set forth in paragraph 3.7; provided, however, that H2C will refund 50% of the Initial Retainer to the Company if H2C terminates the investment banking services prior to performing substantial services pursuant to this Restated Agreement.

   5.6.2   <u>Operational and Strategic Advisory Services</u>. The term of H2C's operational and strategic advisory engagement shall extend for a period of six months from the Effective Date, unless extended by the Parties. Subject to the provisions of paragraph 4.2, 5.1 through 5.5, and paragraphs 5.7 through 5.14, which shall survive any termination or expiration of this Restated Agreement (including by operation of the preceding sentence), either Party may terminate the operational and strategic

advisory services at any time by giving the other Party at least 10 days' prior written notice.  It being understood that any termination of the operational and strategic advisory services for any reason shall not affect the Company's obligations to (i) pay to H2C fees accruing prior to such termination, (ii) provide indemnification pursuant to the terms of this Restated Agreement and (iii) reimburse expenses as set forth in paragraph 4.2.

5.7  <u>Exclusivity</u>.  The Company and H2C each represent to the other that there is no other person or entity that is entitled to a finder's fee or any type of brokerage commission in connection with the Transaction contemplated by this Restated Agreement as a result of any agreement or understanding with it.

5.8  <u>No Third-Party Beneficiaries</u>.  Nothing in this Restated Agreement, expressed or implied, is intended to confer or does confer on any person or entity other than the Parties hereto or their respective successors and assigns, and to the extent expressly set forth herein, the Indemnified Persons, any rights or remedies under or by reason of this Restated Agreement or as a result of the services to be rendered by H2C hereunder.  The Parties acknowledge that H2C is not acting as an agent of the Company or in a fiduciary capacity with respect to the Company and that H2C is not assuming any duties or obligations other than those expressly set forth in this Restated Agreement.  The Company further agrees that neither H2C nor any of its controlling persons, affiliates, directors, officers, employees or consultants shall have any liability to the Company or any person asserting claims on behalf of or in right of the Company for any losses, claims, damages, liabilities or expenses arising out of or relating to this Restated Agreement or the services to be rendered by H2C hereunder, unless it is finally judicially determined that such losses, claims, damages, liabilities or expenses resulted from the bad faith, negligence or willful misconduct of H2C.

5.9  <u>Severability</u>.  The invalidity or unenforceability of any provision of this Restated Agreement shall not affect the validity or enforceability of any other provisions of this Restated Agreement, which shall remain in full force and effect.

5.10  <u>Assignment</u>.  This Restated Agreement may not be assigned by any Party without the prior written consent of the other Party; provided, however, that, at any time or from time to time, H2C shall be entitled to assign this Restated Agreement to any of its affiliates without obtaining the prior written consent of the Company.

5.11  <u>Amendment; Governing Law; Forum</u>.  This Restated Agreement may not be amended or modified except in writing signed by each of the Parties and shall be governed by and construed and enforced in accordance with the laws of the State of North Carolina (without regard to the conflict of laws principles thereof).  The Company and H2C hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the courts of the State of North Carolina located in the County of Rockingham and of the United States District Court for the Middle District of North Carolina (Greensboro Division) for any lawsuits, actions or other proceedings arising out of or relating to this Restated Agreement and agree not to commence any such lawsuit, action or other proceeding except in such courts. The Company and H2C hereby irrevocably and unconditionally waive any objection to the laying of venue of any lawsuit, action or other proceeding arising out of or relating to this Restated Agreement in the courts stated herein and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such lawsuit, action or other proceeding brought in any such court has been brought in an inconvenient forum. Any right to trial by jury with respect to any lawsuit, claim or other proceeding arising out of or relating to this Restated Agreement is expressly and irrevocably waived.

5.12 <u>Notices</u>. Any notice given under this Restated Agreement shall be in writing and shall be mailed or delivered:

    a.   if to the Company, at:

       Board of Trustees
       Morehead Memorial Hospital
       117 E Kings Highway
       Eden, North Carolina, 27288
       Attention: Board Chair

    b.   if to H2C, at its offices:

       4655 Executive Drive, Suite 280
       San Diego, CA 92121
       Attention: William B. Hanlon III, Principal

5.13 <u>Bankruptcy Issues</u>.  Upon filing for protection under Chapter 11 of the U.S. Bankruptcy Code, the Hospital agrees that it will promptly apply to the United States Bankruptcy Court to obtain approval of H2C's retention as exclusive investment banker to the Hospital, and as operational and strategic advisor to the Hospital *nunc pro tunc* to the date of the filing. Notwithstanding anything to the contrary contained herein, after the Hospital files for bankruptcy protection, the fees and expenses of H2C set forth herein shall, subject to the Bankruptcy Court's approval of H2C's retention application, be reimbursed and paid in accordance with the Bankruptcy Code and any fee procedures established by order of the Bankruptcy Court.

5.14 <u>Effective date</u>.  This Amendment shall become effective upon its execution by both parties, but no later than July 10, 2017, the anticipated date of filing for protection under Chapter 11 of the United States Bankruptcy Code.

    The parties have executed this Restated Agreement as reflected below.

              HAMMOND HANLON CAMP LLC

              By:    *William B. Hanlon III*

              Name:   William B. Hanlon III
              Title:    Principal

AGREED AND APPROVED:

Morehead Memorial Hospital

By:    *W. Eugene Russell*

Name:  W. Eugene Russell
Title:    Chairman of the Board

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Case No.** |
| **MOREHEAD MEMORIAL HOSPITAL,** | ) | |
| | ) | **Chapter 11** |
| Debtor. | ) | |
| | ) | |

**AFFIDAVIT OF MICHAEL LANE IN SUPPORT OF MOTION TO EMPLOY**
**HAMMOND HANLON CAMP LLC AS INVESTMENT BANKER AND**
**OPERATIONAL AND STRATEGIC ADVISOR TO THE DEBTOR**

I, Michael Lane, do solemnly depose and declare as follows:

1. I am a Managing Director of the firm of Hammond Hanlon Camp LLC ("H2C"), an independent, healthcare-focused investment banking and financial advisory firm with a particular emphasis on the not-for-profit sector. I specialize in hospital restructuring and bankruptcy.

2. I am fully familiar with the facts hereinafter and submit this affidavit (the "Affidavit") in connection with the Motion to Employ Hammond Hanlon Camp LLC as Investment Banker and Operational and Strategic Advisor to the Debtor (the "Motion")[1] pursuant to Section 327(a) and 328(a) of the Bankruptcy Code and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure.

3. To the extent that any information disclosed herein requires amendment or modification upon H2C's receipt of additional information or as additional information becomes available, a supplemental affidavit will be submitted to the Court.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

1

## H2C Qualifications

4.      H2C is an independent, healthcare-focused investment banking and financial advisory firm with a particular emphasis on the not-for-profit sector. The firm traces its heritage back almost 30 years through its predecessor organizations, including Shattuck Hammond Partners.  With offices in Atlanta, Chicago, New York and San Diego, H2C is uniquely positioned to help the Debtor meet its financial goals.  The firm's principals and managing directors have been lead advisors on hundreds of transactions in the healthcare industry representing billions of dollars in value, offering the experience and industry knowledge to achieve the most favorable results for the Debtor' estate.  H2C has assembled a team of senior professionals that have worked with leading health systems around the country and executed many of the most creative transactions in the healthcare industry.  The firm's leadership leverages more than 230 years of combined experience in the field of healthcare strategy and finance.

5.      Since February 10, 2016, H2C has worked closely with the Debtor's Board of Trustees, management, and other professionals and advisors in exploring various strategic, financial, and restructuring options and otherwise assisting the Debtor in preparing for the commencement of its Chapter 11 case.  Because of its active engagement in these processes, H2C is now intimately familiar with the Debtor's financial affairs, debt structure, business operations, capital structure, key stakeholders, financing documents and related matters.  H2C's pre-petition work for the Debtor has included, but has not been limited to, reviewing and analyzing the Debtors' business, operations and financial projections and advising and assisting the Debtors in identifying key principles and primary objectives for a potential transaction.

6.      Consequently, H2C has developed significant, relevant experience and expertise regarding the Debtor and its current situation and is thus both well-qualified and uniquely suited

2

to provide the required services in this Chapter 11 case. Indeed, if the Debtor was required to retain an investment banker other than H2C in connection with this Chapter 11 case, the Debtor, its estate, and all parties-in-interest would be unduly prejudiced by the time and expenses necessary to familiarize another professional with the intricacies of the Debtor and its business operations. H2C will continue to provide investment banking and operational and strategic advisory services to the Debtor post-petition in accordance with the Engagement Agreement, copies of which are attached as <u>Exhibit A</u> to the Motion.

## Professional Fees and Expenses

7.     As specifically provided in the Engagement Agreement, the proposed Compensation Structure for H2C's services will be bifurcated between H2C's investment banking services to the Debtor (which will be paid a transaction fee, rather than on an hourly basis, plus reasonable and necessary out-of-pocket business expenses) and Michael Lane's operational and strategic advisory services to the Debtor (which will be paid as a fixed monthly fee of $50,000 per month, plus reasonable and necessary out-of-pocket business expenses).

### i.     *Investment Banking Services*

8.     Subject to the Court's approval, and as described in the Engagement Terms, H2C shall be entitled to receive the following as compensation for its investment banking services on behalf of the Debtor:

(a) A retainer of $100,000 which was paid to H2C on August 10, 2016 (the "Retainer")

(b) In the event of a negotiated or competitive sell-side process of the Hospital alone or the Hospital and Nursing Center combined, a success fee of 1.5% of the total consideration earned, due and payable in cash at the closing of the transaction. The success fee shall be contingent upon closing and in addition to the Retainer described in (a) above.

(c) In the event of a separate negotiated or competitive sell-side process of the Nursing Center alone, a minimum Nursing Center success fee of $250,000 earned, due and payable at the closing of the Nursing Center transaction.  In the event that the total consideration for the Nursing Center exceeds $8,000,000, an additional Nursing Center success fee of 5.0% of the total consideration earned, due and payable at the closing of the Nursing Center transaction.  This Nursing Center success fee shall be contingent upon closing and paid in addition to the Retainer and the success fee in paragraph (b) above.

9.    Further, if a transaction occurs either (i) during the term of H2C's engagement under the Engagement Terms, regardless of whether the party or parties to such transaction were identified by H2C or whether H2C rendered advised concerning such transaction, or (ii) at any time during the twelve (12) months following the effective date of termination or expiration of H2C's engagement, and such transaction involves a party identified by H2C, then the Debtor shall pay the success fee to H2C.

10.    H2C also intends to apply to the Court for allowance of compensation for professional services and reimbursement of necessary and reasonable out-of-pocket expenses incurred relating to the provision of investment banking services to the Debtor in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the orders and Local Rules of this Court.

11.    The fee structure for H2C's investment banking services is similar to the terms, both financial and otherwise, agreed to by H2C and other investment banking and financial advisory firms, both inside and outside of bankruptcy, for transactions of similar size and scope. The fee structure was negotiated between the Debtor and H2C and reflects the extensive work to be performed by H2C in this case and H2C's expertise.  The hours worked, results achieved, and the ultimate benefit to the Debtor for the work performed by H2C in connection with its investment banking may vary, and the Debtor and H2C have taken this into account in setting the fees above. The fee structure was established to reflect the difficulty and challenging nature of the engagement.

12.     The ultimate benefit of H2C's investment banking services cannot be measured by reference to the number of hours expended by H2C professionals in the performance of such services. Accordingly, the fee structure is both reasonable and market-based.

ii.     ***Operational and Strategic Advisory Services***

13.     Subject to the Court's approval, and as described in the Engagement Agreement, the Debtor requests that H2C be entitled to receive the following as compensation for Michael Lane's operational and strategic advisory services on behalf of the Debtor:

> (a) A monthly fixed fee of $50,000 per month (the "Monthly Fee") plus reasonable out-of-pocket expenses for the services of Michael Lane.

14.     H2C intends to apply to the Court for allowance of compensation for professional services and reimbursement of necessary and reasonable out-of-pocket expenses incurred relating to the provision of operational and strategic advisory services to the Debtor by Michael Lane in accordance with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the orders and Local Rules of this Court.

15.     The fee structure for H2C's operational and strategic advisory services is consistent with, and typical of, compensation arrangements entered into by H2C and other comparable firms when rendering similar services under similar circumstances. Moreover, given the numerous issues which H2C may be required to address in the performance of its services, H2C's commitment to the variable level of time and effort necessary to address such issues as they arise, and the market prices for such services for engagements of this nature in an out-of-court context, as well as in Chapter 11, I believe that the fee arrangement agreed upon for the operational and strategic advisory services is reasonable under these circumstances.

16.     Further, the Compensation Structure reflects a balance between a fixed, monthly fee, and a deferred amount which is tied to the consummation and closing of the transaction and services contemplated by the Debtor and H2C in the Engagement Agreement.

17.     No compensation has been received by H2C from the Debtor or any other person on said account, except as follows

(a)   In connection with investment banking services provided to the Debtor, H2C received a retainer of $100,000, consisting of an initial retainer of $25,000 paid by the Debtor on February 10, 2016, and a subsequent retainer of $75,000 paid by the Debtor on August 10, 2016, all of which was expended in payment of pre-petition services and expenses or costs advanced.

(b)   H2C was not paid a retainer for the operational and strategic advisory services to be rendered as described herein and in the Engagement Agreement

18.     As part of the overall compensation payable to H2C under the Engagement Agreement, the Debtor has agreed, among other things, to indemnify and provide contribution and reimbursement to H2C and certain related parties, in accordance with the provisions of the Indemnification Agreement.  Unlike the market for other professionals that the Debtor may retain, such provisions are standard terms of the market for investment bankers.  Such provisions are comparable to those generally obtained by investment banking and financial advisory firms of similar stature to H2C and for comparable engagements, both in and out of court.

19.     H2C has agreed not to share (a) any compensation that it may receive with another party or person, other than members of the firm itself or (b) any compensation that another person or party has received.

### H2C's Conflict Check System

20.     A search of the client database of H2C was performed to identify any connections or relationships with the entities with which the Debtor has material relationships as identified by the Debtor.  Such analysis consisted of a review of contacts with the Debtor and entities holding

claims or interests in the Debtor that were made reasonably known to H2C by the Debtor. A list of the parties reviewed is reflected in Schedule 1 to this Affidavit. H2C's review included providing a list of such parties to certain H2C financial professionals and conducting a query of such parties in a database containing the names of individuals and entities that are represented by H2C. A summary of the relationships that H2C identified during this process is set forth in Schedule 2 hereto.

21.     H2C has provided or could reasonably be expected to continue to provide services unrelated to the Debtor's case for the various entities shown on Schedule 2. H2C's assistance to these parties has been related to providing various financial, investment banking, or business consulting services. To the best of my knowledge, no services have been provided to these parties in interest which involve their rights in the Debtor's case, nor does H2C's involvement in this case compromise its ability to continue such consulting services.

22.     Further, as part of its diverse practice, H2C appears in numerous cases and proceedings, and participates in transactions that involve many different professionals, including attorneys, accountants, and financial consultants who may represent claimants and parties in interest in the Debtor's Chapter 11 case. Further, H2C has performed in the past, and may perform in the future, advisory consulting services for various attorneys and law firms, and has been represented by various attorneys and law firms, some of whom may be involved in these proceedings. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships create interest materially adverse to the Debtor in matters upon which H2C is to be employed, and none are in connection with the Debtor or this case.

**Disinterestedness of H2C**

23.     To the best of my knowledge, and based on the results of the conflict search, H2C is a "disinterested person" within the meaning of Section 101(14) of the Bankruptcy Code (as modified by Sections 328(c) and 1107(b) of the Bankruptcy Code), in that, except as otherwise set forth herein, H2C and its professionals:

(a)  are not creditors, equity security holders or insiders of the Debtor;

(b)  are not and were not, within 2 years before the date of the filing of the Debtor's Chapter 11 petitions, directors, officers, or employees of the Debtor; and

(c)  do not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor, or for any other reason.

24.     In addition, to the best of my knowledge and based upon the results of the conflicts search described above, other than as described herein, neither I, H2C, nor any partner or associate thereof, holds nor represents an interest adverse to the Debtor or its estate.

25.     If any new material, relevant facts or relationships are discovered or arise, H2C will promptly file a supplemental affidavit pursuant to Bankruptcy Rule 2014(a).

26.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 10th day of July, 2017.

_Michael Lane_

_____

Michael Lane, Managing Director

## Schedule 1

Morehead Memorial Hospital
Morehead Memorial Hospital Foundation, Inc.
Matthews Health Center
Morehead Urology Associates
Piedmont Surgical Associates
Smith-McMichael Cancer Center
Morehead Memorial Hospital Auxiliary
Dana Weston
Ray Owings
W. Eugene Russell, Esq.
Jeffrey (Jeff) Parris
James (Jim) Burnette
Scott Barham, CPA
Mark Collins
Judy Rouse
Terry Daniel, MD
William J. McLeod, MD
Dr. John Dabbs
First Citizens Bancshares Inc.
American Express
Amn Healthcare Inc
Aramark Corporation
Baxter Healthcare Corp
Cardinal Health
CDW Government Inc
Centurion Medical Products
Clifton Larsen Allen
Covidien
Cross Country Staffing
Crothall
Healthcare Receivables Group
Landmark Transcription
Legacy Healthcare Services Inc
Medassist Firstsource Solutions
Medical Information Technology Inc
Medline Industries
Moonlighting Solutions
NC Emergency Physician Services
Novant Health Shared Services
Novo Health Services/Synergy Health
Nuvasive Inc

Optum Executive Health Resource
Parallon /Chicago Il
Press Ganey Associates
Stryker Instrument Sale Corporation
Totalmed Staffing Inc
Ultimate Software Group Inc
Zimmer Inc
A Safe Hands Transportation Llc
AC Corporation
Accelerated Claims Inc
Accountable Healthcare Staffing
ACPL Accelerated Care Plus
Adams Electric Company
Adams, Douglas H Md
Adex Medical Staffing Llc
Adler Instrument Co.
Advanced Door Automation Overhead
Advanced Home Care Inc
Advanced Medical Designs Inc
Aesculap Inc
Airflow Direction Inc
Akin Gump Strauss Hauer & Field Llp
Alco Sales And Services
Alcopro
Aldrete Score Inc
Alimed Inc
A-M Systems Inc
Amedistaf Llc Dba The Right Solution
American Catheter Corp
American Healthtech
American Industries Inc
American Red Cross Blood Ctr
Analogic Corp
Anewmed Corp
Angiodynamics
Anwar, Mohammad Md
Applied Medical
Arin-American Registry Internet Num
Arrow International
Arthrex Inc
Aureus Radiology Medical
B Braun  Medical Inc
Bard Acess System
Bard, C.R. Inc

Bauerfeind US
Bayer Healthcare
BCI-Brentwood Communications Inc
Beckman Coulter Inc
Beekley Corp.
Biomet Bracing
Bionix
Bio-Tech Prosthetics & Orthotics
Blue Caffe
Blue Elm Company Llc
Blue Health Technology
Bluth, Kirk Md
BMP Print Solutions
Boston Scientific/Microvasive Div
Bottoms, Bill
Bracco Diagnostics Inc
Brady
Brasseler USA
Briggs Corporation
Burrus Medical Inc
CA Short Company Inc
Cabarrus Health Alliance
Canopy Partners Inc
Carefusion
Carolon
Carstens Health Indust.
Century Hosiery Inc
Certicode Llc
Chemgard
Ciox Health Healthport Technologies
Citty'S Plumbing And Pools Inc
Civco Medical Solution Radiotherapy
Civco Medical Solutions
Claro Group
Clia Laboratory Program
Clinical Innovations
Cobex Recorders Inc
College Of American Pathologists
Communication Services
Compliant Healthcare Tech
Compounding Pharmacy
Convergence Service Group Staffing
Cook Medical Inc
Cooper Surgical
Covisint Corporation

Cox, Pam
Cresent Laser Technologies Inc
Crouch, Pete
Cura Script Priority Healthcare
Curbell Medical Products Inc
Custom Medical Specialties, Inc
Cytyc Surgical Limited
Danville Register & Bee
Database Solutions Inc
Datex-Ohmeda/Ge Healthcare
Delta Healthcare Placement Provider
Depuy Ace Orthopaedics
Depuy Synthes
Derma Sciences Inc
Deroyal Industries
Direct Supply Inc
Dixon Hughes Goodman
DJ Ortho Llc
Dusty Ducts, Inc.
Eagle Surgical Products Llc
East Carolina University Brody Sch
Eck Supply Company
Ecolab Food Safety Specialties
Ecolab/Microtek Medical
Eden Rotary Club
Eden's Own
Elekta Inc.
EMI Imaging  Recycling Services
Endo Choice Inc
Enterprise Medical Services
Epiphany Healthcare Data Mgt Llc
Equipment Express
Erbe Inc
Experian Passport Health Commun
Extremity Medical Llc
Federal Express/Fedex
First & Main
Firstpoint Resources Inc
Follett Corporation
Fortified Health Solutions
Freeman Photographics-Amy Freeman
Fusion Medical Staffing Llc
Gammex Rmi
GE Healthcare
George J White Consulting

GHX/Global Healthcare Exchange
Global Equipment Company Inc
Grainger Inc
Greensboro Ahec
Greensboro Radiology
Halyard Sales Llc
Hand Craft Linen Services
Havel's Inc
HBD Inc
Health Care Logistics Inc
Health Information Associates Inc
Healthcare Source Hr Inc
Hemocue/America
HFMA
Hill Rom
Hologic Inc
Hospital Portal Net
Hygia Health Services
Iatric Systems
Idea Art
IMD International Medical
Innovative Group
Inpro Corporation
Instrumentation Lab/Werfen Usa Llc
It's Never 2 Late
JFS Consulting Inc
JJ Keller & Associates
Johnson and Johnson
Johnson's Florist & Antiques
Just Medical Inc
Kerma Medical Products
Key Surgical
Lamar Companies Outdoor Advertising
Landauer Inc
Language Line Services
Lantheus Medical Imaging Inc
LDI Corporation
LR Price Equipment/Hobart
LRS Healthcare
Mainline Medical Inc
Marketlab Inc
Martin, Glenn
Mckesson Medical-Surgical Inc
Medela Inc
Medical Solutions Llc

Medisolv Inc
Medivators Inc
Medtronic SD USA Inc
Medtronic USA Inc
Mercury Medical
Mercy Surgical Dressing Gr Inc
Merit Medical Systems, Inc
Merrill Communications Corporation
Metropolitan Roofing Co.
Mid-State Plumbing
Millenia Medical Staffing Services
Mindray/Datascope Corporation
Minimally Invasive Devices, Inc
Miscellaneous Vendor
Moore Medical Corp.
Morehead Hospt/Flexible Spend Act
Musculoskeletal Transplant Foundation
Mvap Medical Supplies Inc
Natus Medical Inc
Navex Global Inc
NH Winston Neurology
Northfield Instrument Services
Nova Biomedical
Novant Health Cardiology
Optimum Outcomes
Optum 360
Organogenesis Inc
Otis Elevator Co
O'Toole, David, M.D.
Parks Medical Electronics Inc
Parsons, James Md
Pathologists Diagnostic Laboratory
Patterson Medical
PCI Rippey'S Advertising Andwers
Pem Fillings
Pentax
Pharmedium Services Llc
Philips Medical Healthcare
Phillips Healthcare Informatics
Phillips Med Capital
Piedmont Stone Center
POL Consultants Inc
Posey
Precision Dynamics/Pdc
Preferred Medical Marketing Corp

Private Diagnostic Clinic
Professional Finance Company Inc
Prophysics Innovations Inc
Pulse Medical Inc
Quality Mobile Xray & Visions Inc
RCS Wireless Communications Group
RD Plastics Company Inc
Relus Technologies
Revenue Cycle Solutions Group
RN Network
Rockingham Office Machine
Roy, Mark Md
Ruhof Corporation
Safety & Health Connections
Sage Services Group
School Nurse Supply Inc
Sciteck Diagnostics
Sharn
Siemens Medical Solutions
Smith & Nephew Orthopaedics/Charlot
Smith & Newphew Endoscopy
Smith Addressing Machine
Smiths Medical
Solarwinds
Sourcemark Llc
Sourceone/Merry Xray
Spectra Corp
Standard Register/Taylor Comm
Stanley Benefits
Staples Advantage
Sterilmed Inc
Steris Corporation
Storage Systems Unlimited
Storz, Karl
Stryker Endoscopy
Stryker Medical Sales Corp
Stryker Orthopaedic/Howmedica
Stryker Spine
Surgidat Corporation
Systems Electronics Inc
Tacy Medical
Teleflex Medical
Tennant Sales And Service Company
Theracom Inc
Thompson Bros Mechanical Inc

TIDI CFI Products Llc
Triage Consulting Group
Tri-Anim Health Services Inc
Trustaff Travel Nurses Llc
Truven Health Analytics
Typenex Medical Llc
Uline
University Of Wisconsin-Madison
Utah Medical Products Inc
Valley Biomedical Service Inc
Valley Boiler & Mechanical
Veritiv Operating Co/Xpedex
Waste Management
Weiser Security Services Inc
Wolters Kluwer
Wright Printing
Zebra Technologies International
Zoll Medical Corporation
Spray Cotton Mills Llc
William P. Miller
Catharine R. Aron
Lena M. James
Benjamin A. Kahn
Meadow Greens Investors, Llc
Roma Realty Llc
Grant Thornton US LLP
Hammond Hanlon Camp Llc
Donlin, Recano & Company, LLC
Waldrep Llp
Womble Carlyle Sandridge And Rice Llp
Waller Lansden Dortch & Davis Llp
Airgas Usa Llc
AT&T Atlanta
AT&T Newark
Centurylink
City Of Eden
Direct Energy Natural Gas
Duke Energy
Iron Mountain Records Storage
Jenkins Waste Management, Inc.
Orkin
Piedmont Natural Gas
Postage By Phone Reserve Account
Postmaster Eden
Prime Power Services

Saffer Security
Security Alliance Of Va
Security Central
Terminix
Time Warner Cable
Town Of Mayodan
Verizon

## **Schedule 2**

Novant Health Shared Services
Merrill Communications Corporation
Novant Health Cardiology
Optum 360