**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 17-10775 |
| MOREHEAD MEMORIAL HOSPITAL, ) | |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |

**DEBTOR'S RESPONSE TO ORDER TO SHOW CAUSE, IF ANY,**
**WHY THE COURT SHOULD NOT APPOINT PATIENT CARE OMBUDSMAN**

**NOW COMES** Morehead Memorial Hospital, the above-captioned debtor and debtor-in-possession (the "Debtor"), by and through its undersigned counsel, and pursuant to Section 333(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rule 2007.2 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), hereby responds to the Court's sua sponte *Order for Debtor to Show Cause, if any, Why the Court Should Not Appoint Ombudsman* (the "Show Cause Order") [Dkt. No. 22]. In support thereof, the Debtor refers to and relies upon the Affidavit of Dana M. Weston in Support of First Day Motions and Applications (the "Weston Affidavit"), filed with the Court on July 10, 2017 [Dkt. No. 12], and respectfully states as follows:

**JURISDICTION AND VENUE**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are Bankruptcy Code Section 333(a) and Bankruptcy Rule 2007.2.

1

**FACTUAL BACKGROUND**

**I.**   *The Nature of the Debtor's Business*

1.  The Debtor is a North Carolina non-profit corporation that owns and operates a 108-bed general acute care community hospital (the "Hospital") on a 22-acre campus located at 117 East Kings Highway, Eden, North Carolina (the "Hospital Real Property"). Within the Hospital Real Property, the Debtor also owns and operates a 121-bed skilled nursing facility (the "Nursing Center"). In addition to the Hospital Real Property, the Debtor also owns several other parcels of real property located in Eden that are contiguous to, or in the general vicinity of, the Hospital Real Property (collectively, the "Additional Real Property"). The Additional Real Property is as follows:

| *Property Name* | *Location* |
| --- | --- |
| Women's Health Center | 522 S. Van Buren Road, Eden, North Carolina |
| Dayspring Building | 250 W. Kings Highway, Eden, North Carolina |
| Thompson Street Building | 515 Thompson Street, Eden, North Carolina |
| Smith McMichael Cancer Center | 516 S. Van Buren Road, Eden, North Carolina |
| Medical Office Building No.1 | 518 S. Van Buren Road, Eden, North Carolina |
| Medical Office Building No.2 | 522 S. Van Buren Road, Eden, North Carolina |
| Wright Diagnostic Center | 618 S. Pierce Street, Eden, North Carolina |

2.  Founded in 1924, the Debtor is a two-state healthcare system that serves patients in a twelve-zip code area encompassing Rockingham County, North Carolina and neighboring southern Virginia areas. A cornerstone in Eden and one of the top five employers in Rockingham County, the Debtor employs approximately 700 individuals that provide comprehensive medical services to the more than 31,000 people who visit the Debtor's facilities on an annual basis. The Debtor is controlled by an eleven-member board of trustees comprised of community leaders from Eden and Rockingham County (the "Board of Trustees").

3.  The Hospital is one of seven hospital facilities in its local market, serving a population of approximately 200,000 people. The next closest hospital facility is located eleven

miles away. The Hospital's mission is to provide quality care, with a commitment to patient safety and clinical excellence.

4. On its main Hospital campus, the Debtor offers inpatient and day hospital services, a state-of-the-art emergency department, the Nursing Center, a cancer treatment center, and five operating rooms. The Debtor's wide range of services on the Hospital campus include:

   a. A 108-bed hospital facility including 87 medical-surgical beds, nine intensive care beds, and twelve birthing center beds;

   b. Modern equipment and procedures including an electronic medical records system, CT, MRI, lithotripsy, vascular laboratory, laser surgery, angiography, digital mammography, and ultrasound guided and needle localization breast biopsy procedures;

   c. More than ten clinics for delivery of community-based health and wellness;

   d. A 121-bed skilled nursing facility offering short-term, intermediate, and long-term skilled nursing care;

   e. A wound care center with the area's only hyperbaric chambers offering state-of-the-art care for difficult-to-heal wounds;

   f. An occupational health center that supports local industries and businesses with wellness, injury, and workers' compensation management; and

   g. An on-site cancer center.

5. The Debtor's off-campus facilities are highlighted by the Wright Diagnostic Center, offering ultrasound, mammography, urology and wound treatment services, Morehead West Urgent Care, a primary care facility, the Morehead Rehabilitation Center, a physical therapy and occupational therapy facility, and the Matthews Health Center, a family practice facility occupying the same facility as Morehead West Urgent Care.

6. The Debtor continuously strives to provide the highest quality of care to its community. The Debtor's mission statement is to provide quality care, with a commitment to patient safety and clinical excellence. Each member of the Debtor's team works individually and

collaboratively to make their core values of excellence, compassion, respect, teamwork, innovation, and stewardship present in all internal dealings with the Hospital community and in their interactions with those the Debtor is privileged to serve.

## II. *Management Agreement with Novant Health*

7. The Debtor entered into a five-year management agreement with Novant Health, Inc. ("Novant Health"), effective July 1, 2014. Novant Health is a leading healthcare provider with fifteen medical centers and over 400 physician clinic affiliations across North Carolina, South Carolina, Georgia, and Virginia. The goal of the Debtor's partnership with Novant Health is to reduce costs and expand clinical services.

8. Under the terms of the management agreement, Novant Health is responsible for the day-to-day operations of the Hospital. Novant Health employs and provides the Debtor with a Chief Executive Officer and provides non-medical administrative and management support including, but not limited to, supply chain and procurement services.

## **RELIEF REQUESTED**

9. The Debtor seeks entry of an order, pursuant to Section 333(a) of the Bankruptcy Code and Bankruptcy Rule 2007.2, determining that appointment of a patient care ombudsman for the Debtor is not required now. Considering the Debtor's extensive internal quality management procedures, as well as oversight from numerous government agencies and professional associations, the appointment of such an ombudsman would duplicate the Debtor's existing patient care quality management procedures at substantial cost and without increasing the quality of care for its patients.

**BASIS FOR RELIEF**

10. The appointment of a patient care ombudsman is within the Court's discretion. Section 333(a)(1) of the Bankruptcy Code provides for the appointment of an ombudsman "[. . .] <u>unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case</u>." 11 U.S.C. § 333(a)(1) (emphasis added).

11. Pursuant to Section 333(b) of the Bankruptcy Code, an ombudsman is required to:

   a. monitor the quality of patient care provided to patients of the debtor, to the extent necessary under the circumstances, including interviewing patients and physicians;

   b. not later than 60 days after the date of appointment, and not less frequently than at 60-day intervals thereafter, report to the court after notice to the parties in interest, at a hearing or in writing, regarding the quality of patient care provided to patients of the debtor; and

   c. if such ombudsman determines that the quality of patient care provided to patients of the debtor is declining significantly or is otherwise being materially compromised, file with the court a motion or a written report, with notice to the parties in interest immediately upon making such determination.

11 U.S.C. §§ 333(b).

12. Bankruptcy Rule 2007.2(a) states that a bankruptcy court shall appoint an ombudsman under section 333 "unless the court, on motion of the United States trustee or a party in interest filed no later than 21 days after commencement of the case[;] ... finds that the appointment of a patient care ombudsman is not necessary under the specific circumstances of the case for the protection of patients." Fed. R. Bankr. Pro. 2007.2(a) (emphasis added). Notably, "[i]f the court has found that the appointment of an ombudsman is not necessary[,] ... the court, on motion of the United States trustee or a party in interest, may order the appointment at a later time if it finds that the appointment has become necessary to protect patients." Fed. R. Bankr. Pro. 2007.2(b).

5

13. While neither the Bankruptcy Code nor Bankruptcy Rules provide guidance for a bankruptcy court's analysis of the whether the appointment of a patient care ombudsman is necessary, many courts have used a non-exclusive list to determine whether an ombudsman should be appointed.  See, e.g., In re Barnwell County Hosp., Case No. 11-06207-DD, 2011 WL 5443025, at *4 (citing In re Valley Health Sys., 381 B.R. 756, 761 (Bankr. C.D. Cal. 2008) and In re Alternate Family Care, 377 B.R. 754, 758 (Bankr. S.D. Fla. 2007)).  Such factors include:

    (1)    The cause of the bankruptcy;

    (2)    The presence and role of licensing or supervising entities;

    (3)    Debtor's past history of patient care;

    (4)    The ability of the patients to protect their rights;

    (5)    The level of dependency of patients on the facility;

    (6)    The likelihood of tension between the interests of the patients and the debtor;

    (7)    The potential injury to the patients if the debtor drastically reduced their level of patient care;

    (8)    The presence and sufficiency of internal safeguards to ensure appropriate level of care; and

    (9)    The impact of the cost of an ombudsman on the likelihood of a successful reorganization.

In re Barnwell County Hosp., 2011 WL 5443025 at *4.

14. Some additional factors that courts have considered include:

    (1)    The high quality of the debtor's existing patient care;

    (2)    The debtor's financial ability to maintain high quality patient care;

    (3)    The existence of an internal ombudsman program to protect the rights of patients, and/or

  (4)  The level of monitoring and oversight by federal, state, local, or professional association programs which renders the services of an ombudsman redundant.

Id. (citing 3 Collier on Bankruptcy ¶ 333.02, at 333-4 (Alan N. Resnick & Henry J. Sommers eds., 15th ed. 2007)).

  15. "Since the enactment of § 333, bankruptcy courts have sometimes exercised their discretion and held the appointment of an ombudsman unnecessary." In re Barnwell County Hosp., 2011 WL 5443025 at *5-6 (finding the appointment of a patient care ombudsman unnecessary because, among other factors, the rural hospital debtor sought relief under Chapter 9 due to a shortfall of revenue to pay its debts, not because there were any allegations or concerns of deficient patient care). See, e,g., In re RAD/ONE, P.A., Case No. 08-15517-NPO, 2009 Bankr. LEXIS 417 (Bankr. N.D. Miss. Feb. 24, 2009) (declining to appoint patient care ombudsman where debtor had an existing internal ombudsman program and was compliant with regulatory agency requirements); In re Valley Health Sys., 381 B.R. at 756 (declining to appoint patient care ombudsman where health care district had no history of patient care problems and adequate internal monitoring systems); In re William L. Saber, M.D., P.C., 369 B.R. 631, 637-38 (Bankr. D. Colo. 2007) (holding the appointment of an ombudsman was unnecessary because (i) the debtor's bankruptcy filing was not precipitated by concerns relating to the quality of patient care or patient privacy matters; (ii) the financial difficulties during bankruptcy were unlikely to impair the debtor's ability to provide quality medical care; and (iii) the debtor was experienced and in good professional standing); In re Total Woman Healthcare Center, P.C., 14-51197, 2006 Bankr. LEXIS 3411 (Bankr. M.D. Ga. Dec. 14, 2006) (declining to appoint patient care ombudsman where patient care had not been affected by bankruptcy and debtor's obligations not related to patient care).

**I.     *The Factors that Precipitated the Debtor's Chapter 11 Filing Are Financial, <u>Not</u> Related to Patient Care and Safety***

16.     Information regarding the Debtor's business, capital structure, and the circumstances leading to this Chapter 11 filing are set forth in detail in the Weston Affidavit, which affidavit is incorporated herein by reference.

17.     The Hospital follows all applicable regulations and accreditation requirements, as verified by the regular inspection and ongoing certification by various state and federal regulatory agencies and independent monitoring and accreditation agencies.  The decision to seek Chapter 11 bankruptcy relief is in no way predicated on or related to any problem related to patient care, privacy, or safety.  To underscore that patient care is not a cause of the decision to seek Chapter 11 bankruptcy relief, it should be noted that in May, 2017, the Debtor had a very successful regulatory assessment by the DNV GL Healthcare, a worldwide certification and assessment company.  The Debtor received ISO 9001:2008 certification, a designation that assures that it has met a host of quality management standards established by the International Organization of Standards ("ISO").

18.     The Debtor is only one of approximately 150 hospitals in the United States that have achieved the ISO status that is recognized in more than 176 countries.  ISO certification recognizes the Debtor's standards as performing above and beyond those of its peers.  To earn the rating, DNV GL Healthcare worked with Hospital staff to conduct a four-year assessment that evaluated processes such as record keeping, quality, monitoring of effectiveness, and standardizations of best practices in the Hospital.

19.     Among other things, in order to receive ISO certification, the Debtor had to establish a quality manual; create a documented quality management system ("QMS"); and determine how the organizational structure, procedures and processes will satisfy quality

8

objectives.  The quality system requirement is designed to accommodate ongoing internal and external audits of the quality system at least once a year, and more frequently when needed to maintain the integrity of the QMS.  In connection with this certification, the Debtor also conducts regular audits of its routine procedures at least once a month in order to ensure the highest level of patient care and standards are maintained.

20. In addition, the Centers for Medicare & Medicaid Services ("CMS") issues rankings about the quality of care at over 4,000 Medicare-certified hospitals across the country with a tool known as "Hospital Compare."  Hospital Compare is a star rating system that summarizes up to 57 quality measures reflecting common conditions that hospitals treat, such as heart attacks or pneumonia.  The overall rating shows how well a hospital performed, on average, compared to other hospitals in the United States.  The overall rating ranges from one to five stars.  The more stars, the better a hospital performed on the available quality measures.  The most common overall rating is 3 stars.

21. The Debtor is a 3-star rated acute care hospital under Hospital Compare.  For comparison purposes, both North Carolina Baptist Hospital and Novant Health Forsyth Medical Center in Winston-Salem, NC are also 3-star rated acute care hospitals.

22. The Debtor was designated a Tier 1 "Low Cost & High Quality" provider by BlueCross BlueShield of North Carolina.

23. The Debtor has received numerous accreditations recognizing the Hospital's mission to provide excellent patient care.  Among others, the Debtor has received the following accreditations:

(1) Accredited Hospital of the NIAHO® Hospital Accreditation Program by DNV Healthcare under authority granted by CMS

9

(2) Accredited Facility in the area of Adult Transthoracic by the Intersocietal Accreditation Commission Echocardiography;

(3) Accredited Cancer Center by the Commission on Cancer of the American College of Surgeons;

(4) Accredited for Vascular, including Cerebrovascular and Peripheral Vascular, by the Committee on Ultrasound Accreditation of the Commission on Quality and Safety of the American College of Radiology;

(5) Accredited for Mammographic Imaging Services by the Committee on Mammography Accreditation of the Commission on Quality and Safety of the American College of Radiology;

(6) Accredited for Ultrasound Services by the Committee on Ultrasound Accreditation of the Commission on Quality and Safety of the American College of Radiology;

(7) Accredited for Magnetic Resonance Imaging Services by the Committee on MRI Accreditation of the Commission on Quality and Safety of the American College of Radiology;

(8) Accredited for Computed Tomography Services by the Committee on Computed Tomography Accreditation of the Commission on Quality and Safety of the American College of Radiology;

(9) Accredited for Nuclear Medicine Services by the Committee on Nuclear Medicine Accreditation of the Commission on Quality and Safety of the American College of Radiology;

(10) Accredited for Laboratory Services by the College of American Pathologists Laboratory Accreditation Program; and

(11) Accredited for Sleep Laboratory Services by the American Academy of Sleep Medicine.

24. Finally, the Debtor maintains licenses or accreditations with the United States Department of Health and Human Services ("DHSS"), the North Carolina Department of Health and Human Services ("NC DHHS"), Division of Health Service Regulation ("NC DHSR"), and CMS, all of which enforce their own standards of patient care.

### II. *The Debtor Is Subject to Substantial Monitoring by a Variety of Federal and State Regulatory Agencies*

25. The Debtor is already subject to frequent and thorough external oversight. The Debtor is required to comply with regulations enforced and overseen by NC DHSR, which conducts periodic unannounced inspections during which surveyors visit the Debtor's facilities to conduct licensing and certification work, monitor the Debtor's compliance with CMS, DHHS, NC DHHS regulations, and follow up on patient complaints, if any. If the Debtor failed a NC DHSR inspection or failed to correct an issue of noncompliance with state or federal regulations, the Debtor could be at risk of losing its licenses to operate the Hospital and Nursing Center.

26. The Debtor is in full compliance with the patient care and safety standards established by CMS, DHHS, and NC DHHS. Additionally, the Debtor maintains the appropriate and necessary licenses to operate the Hospital and the Nursing Center in the State of North Carolina, which license is renewed annually, and granted based on surveys, patient complaints, and the ability to meet emergency preparedness and life safety requirements.

27. The Debtor must also follow—and does follow—Occupational Safety and Health Administration ("OSHA") guidelines.

28. No action has been taken by any federal or state regulatory authority against the Hospital or the Nursing Center due to patient care or safety issues. Furthermore, there is no evidence of an unusual number of patient complaints made against the Debtor.

### III. *The Debtor Has Strict Internal Quality Controls and Resources to Ensure Patient Care and Safety*

29. The Debtor has served the needs of residents of Eden and Rockingham County for almost 70 years. The Debtor has adopted stringent quality control procedures to ensure the highest level of patient safety and care. They consist of various policies and procedures maintained at all times that allow for a rapid response and correction when those standards are not met.

30. The Debtor has used the principles of ISO 9001 to provide a QMS framework for a collaboratively developed, documents, implemented and maintained, systematic, process oriented, organizational-wide approach to improving organizational performance while complying with all regulatory and accreditation requirements.

31. The Debtor's QMS written documentation includes:

    (1) A written Quality Policy with objectives;

    (2) A written Quality Manual;

    (3) Documented Procedures required by ISO 9001 (Hospital-wide procedures);

    (4) Documents needed by the organization to ensure effective planning, operation and control of processes (Hospital-wide and Departmental Policies); and

    (5) Records required by ISO 9001 stating results achieved or providing evidence of activities performed.

32. The Debtor has a Director of Quality and Risk Management (the "Quality Director") responsible for the overall operation of the Quality Department. The Quality Director also functions as the Patient Safety Officer, responsible for the handling of any patient grievances or concerns. The Quality Director is responsible for aligning performance improvement initiatives with the Hospital's strategic goals, mission, vision and values. The Quality Director also develops, implements, and monitors standard processes and procedures to meet or exceed established clinical quality indicators, patient safety goals, and desired operational efficiency. The Quality Director is knowledgeable about federal, state, and DNV Healthcare standards and regulations affecting quality, patient safety, and performance improvement. The Quality Director also plans, implements, and oversees the Hospital's Risk Management Program including reporting and management of all liability claims and legal defense activities, and ensures adherence to all risk management guidelines. The Debtor's Quality Director is Susan Netherland, RN, BSN, MBA.

33. The Quality Council (the "Quality Council") is the Debtor's oversight body. It is compromised by the members of the Debtor's Board of Trustees, Department Directors, and the Executive Management Team. It meets monthly to review data and discuss any issues relating to patient care and any corrective measures that need to be taken to guarantee the situation is rectified and not repeated. The Quality Council also reviews any Hospital and Nursing Center facility concerns or issues.

34. Within the Quality Council, there is a Patient Care Committee, responsible for evaluating and reviewing infection control and prevention, pharmacy and therapeutics, lab performance, blood utilization, medical records, and nursing practices. There is also a Safety Committee within the Quality Council, responsible for emergency management, radiation safety, recalls, information technology systems, environmental services, occupational health, patient falls, restraints, serious adverse events, code blue/rapid response, and staffing.

35. The Debtor also has a peer performance review committee which is responsible for evaluating and improving physician and medical staff performance. This committee reviews, among other things, mortalities, behavioral issues, blood use, medication use, resource use, infection prevention, and a range of other issues that contribute to the credentialing of the medical staff. As the name suggests, these reviews are conducted by fellow physicians and medical staff both within the same practice field and across fields so that each case is reviewed with a careful and unbiased eye. The peer performance committee meets on a bi-monthly basis.

36. An organizational chart summarizing the above quality review and improvement structure is attached hereto as Exhibit A.

### IV. *Ability of the Patients to Protect Their Rights / No Likelihood of Tension Between the Interests of the Patients and the Debtor*

37. The Debtor has policies for identifying and promptly resolving patient grievances. These policies require that each patient be informed about who to contact in order to file a grievance. Examples of patient grievances include (but are not limited to) all written or verbal complaints regarding patient care, abuse, neglect, harm, HIPAA, or billing practices.

38. All patients are informed in writing upon admission to the Hospital (through a Notice of Patient Rights) of their rights and who to contact to submit a grievance.

39. The person at the Hospital receiving the grievance must document the grievance in detail. During normal business hours, the Quality Department must be notified. During the evening hours and on the weekends, an administrative supervisor is notified and sends the notification to the Quality Department. It is the responsibility of the Quality Department to coordinate the investigation of any complaint and assign appropriate staff to the investigation. All complaints involving HIPAA are referred to a Privacy Officer. The Quality Department sends a written acknowledgement that the grievance has been received and is being investigated within seven business days.

40. The Debtor reviews, investigates, and resolves each patient's grievance within a reasonable time frame. For example, grievances that endanger the patient, such as neglect or abuse, are reviewed immediately, given the seriousness of the allegation and the potential for harm. Regardless of the grievance, the Debtor makes sure it is responding to the substance of each grievance while identifying, investigating, and resolving any deeper systemic problem indicated by the grievance.

41. Occasionally, a grievance is complicated and may require an extensive investigation. On average, such types of grievances are addressed within a time of seven days. If

the grievance is not resolved, or if the investigation is not or cannot be completed within seven days, the Debtor informs the patient or the patient's representative that the Debtor is still working to resolve the grievance and that the Debtor will follow up with a written response within 60 days.

42. A patients or patient representative also has the right to express an appropriate grievance to the state regulator body.

43. A log of grievances is maintained by the Quality Department. The log contains, at a minimum, the nature of the grievance, the actions taken, and any follow up information.

44. The grievance process is approved and monitored by the governing body of the Hospital, which delegates that responsibility to a Grievance Committee. The committee meets on an as needed basis and hears grievances, the results of investigations, and makes recommendations as appropriate.

45. It is highly unlikely that the interests of the Debtor and its patients will diverge. Rather, the Debtor is making every effort to ensure that a high level of care is maintained for the community that it serves.

### V.  *Patients Depend on Debtor for their Health, Safety, and Welfare*

46. The Debtor is licensed by the State of North Carolina for 108 inpatient beds. The Debtor's inpatient services include medical, surgical, intensive care, obstetric, and newborn services.

47. The Debtor's outpatient and ancillary services include an emergency department, diagnostic imaging/radiology, laboratory, endoscopy, surgery, hyperbaric oxygen unit, rehabilitation therapy, physician office care, clinics in area schools, radiation oncology, and long-term care. The Debtor also operates an off-campus wound care center, and provides clinical service of mammography at the Wright Diagnostic Center.

48. The Debtor serves more than 31,000 people who visit the Debtor's facilities on an annual basis. The patients under the Debtor's care are dependent on the Debtor for their health, safety, and welfare when at the Hospital, the Nursing Center, or any of the Debtor's ancillary locations.

### VI. *Potential Injury to Patients if the Debtor Drastically Reduced Its Level of Patient Care*

49. The Debtor is meeting and/or exceeding national staffing ratios. The Debtor works to ensure that patient care is provided in an appropriate and planned manner consistent with patient's rights and needs using the DNV Healthcare standards.

### VII. *Substantial Expense Associated with Appointment of a Patient Care Ombudsman Would Hamper the Debtor's Restructuring Efforts*

50. For the reasons stated above, a patient ombudsman is not currently necessary to protect the interests of patients and would unnecessarily duplicate services that are already being provided by the Debtor. The substantial expense associated with appointment of a patient care ombudsman would hamper the Debtor's restructuring efforts. Those expenses would include not only the ombudsman's fees, but also additional fees retained by the ombudsman's professionals. Particularly, considering the Debtor's existing internal and external monitoring and the Debtor's history of quality patient care, the costs associated with an ombudsman in this case would serve only to drain the Debtor's financial resources and jeopardize the Debtor's ability to reorganize and continue to serve its community.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter an Order determining that appointment of a patient care ombudsman for the Debtor under Section 333 of the Bankruptcy Code and Bankruptcy Rule 2007.2 is <u>not</u> required at this time, and (ii) grant such other and further relief as is just and proper.

Respectfully submitted, this the 13th day of July, 2017.

        **WALDREP LLP**

        /s/ *Thomas W. Waldrep, Jr.*
        Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
        Jennifer B. Lyday (NC Bar No. 39871)
        Francisco T. Morales (NC Bar No. 43079)
        101 S. Stratford Road, Suite 210
        Winston-Salem, NC 27104
        Telephone: 336-717-1440
        Telefax: 336-717-1340
        Email: notice@waldrepllp.com

        *Proposed Attorneys for the Debtor*

# EXHIBIT A



Quality Improvement Reporting Structure FY 2017