UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION


In re:
Morehead Memorial Hospital

No. 17-10775
Chapter 11


RESPONSE  BY LABORATORY CORPORATION OF AMERICA HOLDINGS  TO
TO DEBTOR'S "AMENDED NOTICE OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES SUBJECT TO ASSUMPTION AND ASSIGNMENT AND
PROPOSED CURE AMOUNTS"

Comes the creditor Laboratory Corporation of America Holdings  ("LabCorp"), by
counsel, and hereby interposes this Response in objection to a portion of the debtor's "Amended
Notice of Executory Contracts and Unexpired Leases Subject to Assumption and Assignment
and Proposed Cure Amounts" (herafter "Amended Notice").

In support of its Response, LabCorp states as follows:

1.  LabCorp and the debtor are together the principal parties to a certain "Technical
Support Agreement" with exhibits, attachments and addendum, dated 12/23/15.  A copy said
executory contract is attached hereto as Ex. "A".

2.  Ex. "A" forms the basis of that certain Proof of Claim $#137 filed by LabCorp, by
counsel, dated 10/26/17, for $263,579.43.  That figure represents the pre-petition arrearages due
to LabCorp upon its Ex. "A".  LabCorp hereby additionally incorporates by reference the exhibits
attached to its Proof of Claim.

3.  The debtor has understated by $75,999.43 the amount of pre-petition arrearages due
LabCorp at p. 7 of 15 of Ex. "A" to the debtor's Amended Notice.     The correct figure for pre-
petition arrearages is $263,579.43, not $187,580.00.

4.  The amount of LabCorp's *pre*-petition arrearage above does not include any of a
growing *post*-petition balance due, being a further and additional $157,886.43 as of 10/23/17 and
deepening by the day.

WHEREFORE, LabCorp, by counsel, prays:

A.  That the debtors' proposed cure amount in its Amended Notice be modified to match
LabCorp's Proof of Claim amount; and

B.  That a hearing be set upon said Notice; and

C.  For all other relief to which LabCorp. is entitled.

Dated: 10/30/17.

/s/Franklin Drake
Franklin Drake, NCSB #8732
Att'y for LabCorp
PO Box 26268
Raleigh, NC 27611
919-250-2000
Fax 919-250-2100
Fdrake@smithdebnamlaw.com



## TECHNICAL SUPPORT AGREEMENT

This Agreement made this 23rd day of December, 2015, by and between Morehead Memorial Hospital ("HOSPITAL") with its principal place of business at 117 East Kings Hwy, Eden, North Carolina 27288 and Laboratory Corporation of America Holdings ("LABCORP") with offices at 531 South Spring Street, Burlington, North Carolina 27215.

WHEREAS, LABCORP is engaged in the business of providing reference clinical laboratory services and is experienced in operating and managing clinical laboratories; and

WHEREAS, the HOSPITAL owns and operates general acute facilities, including a clinical laboratory, ("Laboratory") located at 117 East Kings Hwy, Eden, North Carolina 27288; and

WHEREAS, HOSPITAL desires to contract with LABCORP to operate and manage the Laboratory for HOSPITAL in accordance with the terms and conditions set forth in this Agreement, and LABCORP desires to provide the services described herein.

### IT IS THEREFORE AGREED AS FOLLOWS:

1. **TERM AND TERMINATION**
   (A) **INITIAL TERM**
   The initial term of this Agreement shall be five (5) years (the "Initial Term") commencing on January 11, 2016 and ending January 10, 2021. During this Initial Term, this Agreement shall be cancelable only for cause as defined in Section 2 below.

   (B) **ADDITIONAL TERM**
   After the Initial Term, this Agreement shall be automatically renewed subject to price changes for an additional period of three years at the end of the Initial Term or any Additional Term unless previously terminated by either party (the "Additional Term"). During the Additional Term either party may terminate this Agreement, with or without cause, upon a 90 day written notice to the other party.

   (C) **HOSPITAL'S OBLIGATION UPON TERMINATION**
   In the event that HOSPITAL terminates this Agreement at any time with or without cause, HOSPITAL agrees (i) to purchase at fair market value (as determined by an independent appraiser) or net book value, whichever is greater, all major equipment purchased by LABCORP to perform services under this Agreement and located on-site (ii) to the extent assumable, assume all contracts and leases for laboratory services, equipment or reagents which LABCORP has entered into or acquired on behalf of and with the consent of HOSPITAL (but excluding any software license if applicable), (iii) to reimburse LABCORP, on an amortized pro-rata basis, as set forth in Attachment A, attached hereto and incorporated herein by reference, for costs incurred for the initial start-up of this Agreement, (iv) to reimburse LABCORP, on an amortized pro-rata basis, for the installation costs associated with the Laboratory Management System, as set forth in Attachment B, attached hereto and incorporated herein by reference, and (v) to reimburse LABCORP for amount paid by LABCORP for assumption of equipment reagent rental obligations pursuant to Section 6H, on an amortized pro-rata basis, with such amortization period beginning on the date the equipment reagent rental obligation has been assumed by LABCORP pursuant to Section 6H and ending at the conclusion of the Initial Term, as set forth in Attachment G, attached hereto and incorporated herein by reference. Notwithstanding the above, LABCORP, at its option, may choose to retain any or all equipment, contracts or leases. Provided however, should LABCORP choose to retain such equipment, LABCORP will lease to HOSPITAL, at fair market rates, any such equipment necessary for the continued operations of the Laboratory for a period of ninety (90) days. Equipment not purchased by LABCORP and owned by the HOSPITAL before the Initial Term will remain property of the HOSPITAL upon termination.

2. **TERMINATION FOR CAUSE**
   The parties may terminate this Agreement for cause as set forth below:

   (A) HOSPITAL may terminate this Agreement upon failure of LABCORP to cure a quality problem as set forth herein. In the event that the Laboratory Advisory Committee's Review (as described in Sections 10 and 11 below) shall substantiate all or any part of any quality problem submitted to the Committee by HOSPITAL, LABCORP shall be so notified by the Committee in writing. LABCORP shall have up to ninety (90) days to cure such quality problem to the satisfaction of the Committee, provided LABCORP undertakes efforts within thirty (30) days of such notice to affect a cure. Termination shall be effective thirty (30) days after receipt by LABCORP of written notice of termination by HOSPITAL if LABCORP has failed to undertake efforts to cure such quality problem within such thirty (30) day period or ninety (90) days after receipt by LABCORP of written notice of termination by HOSPITAL if LABCORP has taken efforts but has failed to cure such quality problem within such ninety (90) day period. Termination of this Agreement shall be HOSPITAL's sole and exclusive remedy.

(B)    LABCORP may terminate this Agreement upon sixty (60) days prior written notice to HOSPITAL in the event that LABCORP fails to meet its profitability goals, in regards to this Agreement.

(C)    Either party may terminate this Agreement in the event of a breach of any of material term of this Agreement, if such breach is not cured within thirty (30) days after written notice of the breach is given to the breaching party by the non-breaching party.

(D)    Either party may terminate this Agreement in the event of a merger, sale or transfer of all of the assets of either party upon sixty (60) days prior written notice to the other party.

(E)    Either Party may terminate this Agreement immediately, in the event that either party: (i) enters into an assignment for the benefit of creditors; (ii) is adjudged bankrupt; (iii) is unable to pay debts as they become due; (iv) has a trustee, receiver or other custodian appointed on its behalf; or (v) has any other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding commenced against it, which case or proceeding is not dismissed within sixty (60) days of filing.

3.    **FEES**

(A)    **MONTHLY PAYMENT**
As compensation for services rendered pursuant to this Agreement, HOSPITAL shall pay LABCORP the fees set forth on Attachment C, attached hereto and incorporated herein by reference.

LABCORP will submit to HOSPITAL a monthly statement of services rendered to HOSPITAL by LABCORP for the prior month, and HOSPITAL agrees to remit payment to LABCORP. Payment for tests and services is due 30 days after the date of invoice. Failure to remit payment within said term may result, among other remedies available to LABCORP, in the immediate discontinuation of service without further notice as provided above. LABCORP may, at its option, reinstate services after HOSPITAL brings its balance current. Nothing in the foregoing provision shall serve to waive any rights or remedies available to LABCORP with respect to its providing of services to HOSPITAL. If LABCORP is compelled to bring suit to collect amounts due hereunder it shall be entitled to recover amounts due, reasonable attorney's fees, and costs of suit incurred in connection with the action.

(B)    **RIGHT TO AUDIT**
Each monthly payment shall be accompanied by a signed statement from HOSPITAL's Chief Financial Officer or his designee certifying the Laboratory activity for the prior month. In order to verify these data, LABCORP shall have the right to conduct an audit, at its expense, within 120 days of the close of HOSPITAL's fiscal year. If HOSPITAL accepts the outcome of the audit and HOSPITAL has underpaid LABCORP, HOSPITAL shall remit payment of the balance of the underpaid amount to LABCORP within 30 days of the audit report. If the outcome of the audit is unacceptable to HOSPITAL, the audit shall be reviewed by a third party acceptable to both HOSPITAL and LABCORP, or HOSPITAL shall select one person and LABCORP shall select one person and both such designees shall select a third party. The majority of the three designees shall make the determination. HOSPITAL and LABCORP shall share equally the expense of such determination. If the results of the audit indicate that LABCORP has been overpaid by HOSPITAL, LABCORP shall remit the amount of the overpayment to HOSPITAL within 30 days of the audit report.

The amount of any under or overpayment determined by the audit shall be promptly remitted by the appropriate party as set forth above. In the event the audit determines that there has been an overpayment or underpayment in excess of ten percent (10%), in the case of an underpayment, HOSPITAL shall bear the expense of the audit and in the case of an overpayment, LABCORP shall bear the expense of the audit.

(C)    **ANNUAL FEE INCREASE**
On the first anniversary of the effective date of this Agreement, and every year thereafter, LABCORP will increase the fees set forth on Attachment C by a percentage equal to the percentage increase, if any, in the United States Department of Labor Consumer Price Index for all urban consumers (U.S. City Average) published by the Bureau of Labor Statistics ("CPI") for the preceding twelve months, or three (3%) percent, whichever is lesser, provided that such increase shall not exceed three percent (3%) in any given year.

4.    **REFERENCE TESTING**
HOSPITAL shall be solely responsible for determining and negotiating an agreement for reference testing. There shall be no requirement that such agreement be with LABCORP. In the event such reference testing agreements is with LABCORP, such agreement shall be independent of this Agreement and fees for such reference testing shall be at fair market value.

5.    **CONSULTATION**
At the option of the parties, HOSPITAL and LABCORP may meet and confer in good faith at the end of each calendar quarter, or more often if warranted, during the Initial Term, and any Additional Terms, of this Agreement to discuss any concerns either of them

2

may have with any of the provisions, conditions or the implementation of this Agreement, and to suggest appropriate changes in operational procedure to address such concerns.

6. **DUTIES OF LABCORP**

(A) **MANAGER**
LABCORP will, in consultation with HOSPITAL, provide the Laboratory with the services of a qualified Laboratory Manager (the "Manager") to discharge the obligations of LABCORP under this Agreement. Such person will be an employee of LABCORP throughout the Initial Term, and any Additional Terms, of this Agreement, and LABCORP will determine the amount of and will pay compensation to the Manager for all services rendered in connection with this Agreement. Any replacement candidate for Laboratory Manager shall be interviewed by both HOSPITAL and LABCORP and shall be mutually agreed upon. Notwithstanding the aforementioned, LABCORP shall have final decision in the matter. The scope of services of LABCORP and the Manager include the following:

- Develop a laboratory equipment plan for the Laboratory and oversee execution of the equipment plan.
- Develop supporting reagents, pharmaceuticals and medical consumables required to support the test menu and test volume.
- Recommend an appropriate organizational structure and personnel plan for the Laboratory, to include scheduling of Laboratory staff and regular performance evaluations of such staff
- Recommend policies and procedures which will promote efficiencies and quality assurance in the Laboratory.
- Assist in training Laboratory personnel.
- Assist in implementing an appropriate information technology plan for an effective laboratory information management system.
- Develop a business plan for the Laboratory.
- Oversee and work collectively with the Medical Director to ensure compliance with CAP and other applicable accreditation agencies.

The Manager will give instructions to Laboratory personnel and if such employees do not follow such instructions or if there are any other individual performance issues, the Manager will report such issues to HOSPITAL, and HOSPITAL will consult with the Manager regarding resolution of such matters. HOSPITAL will determine what, if any, action should be taken with respect to such issues, and HOSPITAL shall be responsible for all actions with respect to Laboratory personnel, including hiring, firing and other discipline, promotion and benefits.

(B) **LABORATORY SERVICES**
Laboratory performs the tests set forth on Attachment F attached hereto and incorporated herein by reference. LABCORP will provide services to the Laboratory in accordance with CAP, CLIA and the standards set forth in Attachment C which may be adjusted with the mutual written consent of both parties in accordance with Section 22. LABCORP shall maintain, throughout the Initial Term, and any Additional Terms, of this Agreement, a level of quality of testing services ("Quality") by Laboratory necessary to ensure standards of patient care at HOSPITAL which are commensurate with reasonable care. The elements of Quality shall be deemed to be: (i) accurate results; (ii) timely reporting; (iii) trained personnel; (iv) appropriateness of type of tests offered; and (v) such other elements as are or become generally recognized in the clinical laboratory industry as measures of quality of service and are mutually agreed upon by both parties.

(C) **SUPPLIES**
LABCORP will provide, at its expense, all laboratory supplies necessary for the efficient operation of the Laboratory and the performance of Laboratory tests set forth in Attachment F. HOSPITAL will provide to LABCORP the use of any existing supplies, reagents and consumables used in the Laboratory at the time this Agreement is executed (the "Supplies"). LABCORP shall document these Supplies by means of an inventory, which is agreed to in writing by LABCORP and HOSPITAL (the "Inventory"). Upon termination or expiration of this Agreement, LABCORP will leave HOSPITAL with supplies, reagents and consumables in amounts approximately equal in value to those Supplies provided to LABCORP at the commencement of this Agreement as specified in the Inventory.

(D) **LABORATORY EQUIPMENT**
LABCORP will install, provide and maintain the laboratory equipment set forth in Attachment D attached hereto and incorporated herein by reference.

(E) **FINANCIAL PERFORMANCE**
(i) Supply Chain Savings. LABCORP will measure cost savings for the Laboratory as a whole with respect to equipment and supplies. Commencing with the period starting on January 11, 2016 and ending on January 10, 2017 (the "Comparison Date") and continuing on an annual basis thereafter (each subsequent January 10th is also a Comparison Date), LABCORP will measure cost savings by comparing the Total Current Expense of the HOSPITAL Laboratory under Part 1 of the Preliminary Technical Support Analysis delivered by LABCORP to

3

HOSPITAL dated December 10, 2015 (the "Analysis") to the same components of Laboratory expenses on the Comparison Date, with a goal of achieving the Total Proposed Expense set forth in the Analysis. Each such comparison will be annualized for periods shorter than twelve months and will be prorated for HOSPITAL, the services for which are implemented or terminated during a comparison period. In addition, in determining comparisons, the calculations will be made assuming all test volumes and test mixes are the same as they were represented in the Analysis.

(ii)    Re-engineering Savings. LABCORP will measure cost savings for the Laboratory as a whole for efficiencies created by policy changes in the Laboratory with respect to laboratory processes and organization. LABCORP will recommend a plan of action to create behavioral efficiencies and, with the cooperation of HOSPITAL, will implement such plan. LABCORP shall not be responsible for obtaining re-engineering savings to the extent savings are not obtained due to the failure of HOSPITAL to cooperate in implementing the re-engineering plan. On each Comparison Date, LABCORP will measure cost savings by comparing the total estimated re-engineering savings under the Analysis to the actual performance of the Laboratory on each Comparison Date. Each such comparison will be annualized for periods shorter than twelve months and will be prorated for HOSPITAL the services for which are implemented or terminated during a comparison period. In addition, in determining comparisons, the calculations will be made assuming all test volumes and test mixes are the same as they were represented in the Analysis.

(F)    **MAINTENANCE OF THE HOSPITAL EQUIPMENT**
Ordinary wear and tear excepted, LABCORP will maintain the Laboratory equipment in good working order, at LABCORP's expense, during the Initial Term, and any Additional Terms of this Agreement. LABCORP reserves the right to ascertain the condition of any equipment that may be available from HOSPITAL for utilization in the Laboratory prior to the implementation of the Agreement. If LABCORP determines that any equipment needs substantial maintenance to insure proper operation, HOSPITAL agrees to pay all of the cost of such maintenance which will be included in the first month's payment of fees to LABCORP.

(G)    **BLOOD BANKING SERVICES**
LABORATORY shall be responsible for the management and handling of the blood products which will be stored in the Laboratory, including performing cross-match testing as required. HOSPITAL shall retain responsibility for purchasing the blood, blood products and supplies.

(H)    **ASSUMPTION OF EQUIPMENT REAGENT RENTAL OBLIGATIONS**
LABCORP will assume certain equipment reagent rental obligations of the HOSPITAL as set forth in Attachment G attached hereto and incorporated herein by reference, with HOSPITAL repaying LABCORP for the cost of such assumption as provided on Attachment B, attached hereto and incorporated herein by reference and in Section 1(C) above.

7.    **DUTIES OF HOSPITAL**
(A)    **SPACE, UTILITIES, AND SERVICES**
HOSPITAL will provide to LABCORP, at HOSPITAL's expense, reasonably sufficient space and appropriate HVAC systems, utilities, internal phone systems, janitorial services, engineering parts, and services for the day-to-day operation of the Laboratory.

(B)    **WASTE DISPOSAL**
HOSPITAL shall be responsible for the disposal of all waste in accordance with federal and state laws and regulations.

(C)    **CHARGES, BILLING, AND COLLECTION**
HOSPITAL will establish the overall charge structure for Laboratory services and will be solely responsible for the issuance of all patient bills, third party billing, and collection of accounts. HOSPITAL agrees to bill in compliance with all appropriate laws and regulations, and agrees to indemnify LABCORP for any damages or claims incurred by LABCORP as a result of HOSPITAL's billing practices.

(D)    **EMPLOYEE PRIVILEGES**
HOSPITAL will make available to LABCORP's employees and/or independent contractors minor complimentary services which are available to the HOSPITAL's employees, such as cafeteria privileges, discounts, personal security, social functions, parking and related services.

(E)    **BLOOD PRODUCTS**
HOSPITAL shall be responsible for purchasing all blood, blood products and supplies associated with the transfusion of blood, blood components and products. Blood products will be stored in the Laboratory and released to HOSPITAL as requested.

4

   (F)   **POINT OF CARE TESTING**
HOSPITAL shall be responsible for the performance of and expenses associated with all Point of Care Testing.

   (G)   **SPECIMEN COLLECTION SERVICES**
HOSPITAL will provide all specimen collections services, including phlebotomy, for specimens which will be delivered by HOSPITAL to the Laboratory for testing. All such personnel will be employees or independent contractors of HOSPITAL.

   (H)   **UNUSUAL LABORATORY RESPONSIBILITIES**
HOSPITAL shall be responsible for all non-clinical laboratory type activities that may take place in the Laboratory.

   (I)   **OTHER PERSONNEL**
HOSPITAL, with the assistance of LABCORP, shall determine the number and qualifications of any other personnel which may be required for the efficient operation of the Laboratory. All such personnel will be employees or independent contractors of HOSPITAL and will be subject to the personnel policies and benefits of HOSPITAL but will also follow the applicable rules and regulations of LABCORP. In the event that either HOSPITAL or LABCORP hire employees formerly employed by the other, the prior employer will be responsible for any benefits accrued by such employees during their prior employment.

8.   **PROHIBITION AGAINST HOSPITAL RECRUITMENT OF LABCORP EMPLOYEES**
During the Initial Term, and any Additional Terms, of this Agreement, and for a period of 12 months following its expiration or termination, HOSPITAL will not hire, or contract with as an independent contractor, without LABCORP's prior written consent, any individual who is or was an employee of LABCORP during the Initial Term, and any Additional Terms, of this Agreement, including, but not limited to, the Laboratory Manager. In addition, HOSPITAL will not discuss the possibility of, or make any job offer to, any person who is or was an employee of LABCORP during the Initial Term, and any Additional Terms, of the Agreement without LABCORP's prior written consent. HOSPITAL acknowledges and agrees that these restrictions are reasonable and necessary to protect the legitimate interests of LABCORP. Notwithstanding the above, any employee hired by LABCORP at the inception of this Agreement who was formerly a HOSPITAL employee shall be exempted from these restrictions.

9.   **LABORATORY MEDICAL DIRECTOR**
   (A)   **SELECTION AND PAYMENT**
HOSPITAL shall contract for, in consultation with LABCORP, the services of a qualified Pathologist to act as Medical Director of the Laboratory and to perform those aspects of Laboratory services required to be performed by a Pathologist. HOSPITAL shall be responsible for all expenses of providing the Pathologist. LABCORP reserves the right to approve of any Pathologist selected by HOSPITAL; however, LABCORP's approval of HOSPITAL's selection shall not be unreasonably withheld.

   (B)   **DUTIES**
The Medical Director's duties shall be confined to his or her practice of medicine and shall not interfere with LABCORP's management of the Laboratory, except as required by law. Particular duties required from the Medical Director are described in Attachment E.

10.   **LABORATORY ADVISORY COMMITTEE**
   (A)   HOSPITAL and LABCORP together will establish a Laboratory Advisory Committee (the "Committee") for the purpose of reviewing Quality pursuant to Section 6 (B) hereof. The Committee shall be comprised of five (5) persons: one (1) HOSPITAL representative; two (2) LABCORP representatives and one (1) members of the HOSPITAL Medical Staff designated by HOSPITAL. The fifth (5th) member of the Committee shall be the Laboratory Medical Director. The Committee shall act, upon proper notice thereof, on the decision of a majority of its members at any meeting at which at least three (3) members are present and both parties are represented.

   (B)   The function of the Committee shall be to (i) review any issues relating to Quality which may arise from time to time, and (ii) which HOSPITAL and LABCORP shall be unable to resolve promptly after a good faith effort to do so. In the event HOSPITAL and LABCORP cannot promptly resolve such issues, HOSPITAL shall document in writing such problems and submit to LABCORP and the Committee at least 15 days prior to any review thereof by the Committee. The Committee's review shall be limited to the matters set forth in such documentation. In the event of a Committee decision adverse to LABCORP, HOSPITAL's sole and exclusive remedy shall be termination of this Agreement pursuant to Section 2 of this Agreement.

11.   **REVIEW PROCESS BY LABORATORY ADVISORY COMMITTEE**
In performing any Quality Review, the COMMITTEE shall be guided by the standards established in this Agreement and shall consider only those elements of Quality as set forth in Section 6 (B).

5

12. **CHANGE IN SERVICES**
Should HOSPITAL request changes to Laboratory's services or facilities change, or request additional services, or the elimination of certain services that materially affect the operating expenses of the Laboratory, LABCORP and HOSPITAL agree to re-negotiate, in good faith, the terms of this Agreement, including the fees to be paid for such services, prior to implementing such changes. Any such changes in services or terms shall be in writing and signed by the parties. In addition, if for any reason, if at any time, LABCORP's fees are no longer consistent with fair market value, LABCORP and HOSPITAL agree to renegotiate in good faith to make the fees again consistent with fair market value.

13. **MANNER OF PERFORMANCE**
Each party shall, at all times, act as an independent contractor, and shall not act as an agent or employee of the other party. Neither party shall withhold any taxes on behalf of the other party or any person employed by the other party. No employee or independent contractor of LABCORP shall have any claim under this Agreement or otherwise against HOSPITAL for wages, vacation pay, sick leave, unemployment insurance, worker's compensation, retirement benefits or employee benefits of any kind. The minor complimentary services specified in Section 7 (D) are not, and shall not be deemed to be employee benefits. No employee or independent contractor of HOSPITAL shall have any claim under this Agreement or otherwise against LABCORP for wages, vacation pay, sick leave, unemployment insurance, worker's compensation, retirement benefits or employee benefits of any kind.

14. **INSURANCE**
Both parties shall obtain and maintain throughout the term of this Agreement, minimum insurance coverage as follows:

| | |
|---|---|
| Worker's Compensation: | Statutory Amount |
| Comprehensive General Liability and Property Damage: | $1,000,000 |
| Automobile Liability (if applicable): | $1,000,000 |
| Professional Liability | $1,000,000/$3,000,000 |

15. **ACCESS TO BOOKS AND RECORDS**
If the Services to be provided by LABCORP hereunder are subject to the disclosure requirements of 42 U.S.C. 1395x (v) (1) (I), LABCORP shall until expiration of six (6) years make available, upon written request of the Secretary of Health and Human Services, or upon request of the Comptroller General, or any of their duly authorized representatives, a copy of this Agreement and the books, documents and records of LABCORP that are necessary to certify the nature and extent of the costs incurred under this Agreement through a subcontractor with a value or cost of ten thousand dollars ($10,000) or more over a twelve (12) month period. In addition, with respect to any applicable subcontract, such subcontract shall contain a clause to the effect that, should the subcontractor be deemed a related organization, until the expiration of six (6) years after the furnishing of services pursuant to such subcontract, the subcontractor shall make available upon written request of the Secretary of Health and Human Services, or upon request of the Comptroller General, or any of their duly authorized representatives, a copy of the subcontract, and the books, documents and records of such third party that are necessary to verify the nature and extent of the costs incurred under this Agreement.

During the term of this Agreement, upon reasonable prior written request and during normal business hours, LABCORP shall allow HOSPITAL reasonable access to LABCORP records concerning the services provided hereunder.

16. **NON-DISCRIMINATION**
As provided by applicable laws, neither LABCORP nor HOSPITAL will discriminate against any patient or applicant for employment on the basis of race, color, sex, age, religion, national origin, or handicap in providing services under this Agreement.

17. **INDEMNIFICATION**
LABCORP agrees to defend, indemnify, and hold HOSPITAL, its parent, subsidiaries, affiliated and related companies, directors, officers, employees, and agents wholly harmless from and against all third party claims, losses, lawsuits, settlements, demands, causes, judgments, expenses, and costs (including reasonable attorney fees) arising under or in connection with this Agreement to the extent that such costs and liabilities are proximately caused by the negligence or willful misconduct of LABCORP, provided, however, this indemnification by LABCORP will not apply to claims by HOSPITAL employees. HOSPITAL agrees to defend, indemnify, and hold LABCORP, its parent, subsidiaries, affiliated and related companies, directors, officers, employees, and agents, wholly harmless from and against all third party claims, losses, lawsuits, settlements, demands, causes, judgments, expenses, and costs (including reasonable attorney fees) arising under or in connection with this Agreement to the extent that such costs and liabilities are proximately caused by the negligence or willful misconduct of HOSPITAL or any claims by the HOSPITAL's employees.

An indemnitee entitled to indemnification under this Section shall give written notice to the indemnitor of a claim or other circumstances likely to give rise to a request for indemnification, within 30 days after the indemnitee becomes aware of the same. The indemnitor shall be afforded the opportunity to undertake the defense of and to settle by compromise, or otherwise, any claim for which indemnification is available under this Section. If the indemnitor so assumes the defense of any claim, the

6

indemnitee may participate in such defense with legal counsel of its selection and at its expense. If the indemnitor, prior to the expiration of 30 days after receipt of written notice of a claim by the indemnitee under this Section, has not assumed the defense thereof, the indemnitee may thereupon undertake the defense thereof on behalf of, and at the risk and expense of, the indemnitor with all reasonable costs and expenses of such defense to be paid by the indemnitor. No compromise or settlement of any such claim shall be made without the prior written consent of the indemnitor, which consent shall not be unreasonably withheld or delayed.

In no event shall either party be held responsible for punitive damages, or consequential, incidental, or special damages (including lost profits or revenue).

18.   PROFESSIONAL AND LICENSING STANDARDS AND CERTIFICATION
      (A)   All licenses, permits and certifications related to the operation of the Laboratory shall be obtained and maintained by HOSPITAL and HOSPITAL shall be responsible for all fees associated with such licensure, permits and certifications including, but not limited to, the associated fees for maintaining accreditations. HOSPITAL shall be solely responsible for compliance with all regulatory requirements relating to such licenses, permits and certifications.

      (B)   LABCORP shall cause all of its employees performing services in Laboratory to perform their duties in accordance with all applicable local, state and federal licensing requirements, CAP, CLIA, as well as such state and national standards of professional ethics and practice as may be applicable. LABCORP shall assist HOSPITAL in maintaining its certification under DNVGL Healthcare.

      (C)   HOSPITAL shall be solely responsible for the resolution, (including any corrective actions and penalties) of any pending or identified deficiencies associated with licensure or accreditation which arose prior to the effective date of this Agreement.

19.   HOSPITAL WARRANTIES
      (A)   HOSPITAL warrants and covenants that it shall exercise due care in causing its structure and activities to comply with all applicable local, state and federal laws and authorities, including without limitation, all truth in billing and similar laws, as well as such standards of professional ethics and practice as they apply to the financial interests of physicians in organizations involved in the provision of medical services.

      (B)   HOSPITAL warrants that none of its employees have been suspended or excluded from participation in any state or federal health care program or have had civil monetary or other sanctions imposed upon them by governing bodies of state or federal health care programs.

      (C)   HOSPITAL warrants and covenants that (a) it is not owned directly or indirectly, in whole or in part, by any physician or immediate family member of a physician; (b) that it does not, and shall not enter into any "compensation arrangement" or have or permit any investment interest to be obtained in HOSPITAL, as such terms are defined in Section 1877 of the Social Security Act (commonly known as the "Stark Provisions") without giving LABCORP a 60-day prior written notice, during which period LABCORP may terminate this Agreement upon a 30-day written notice; and (c) that it will not act or engage in any similar practice which is prohibited by 42 U.S.C. 1320, or any similar state or federal anti-kickback laws or regulations.

      (D)   HOSPITAL certifies that it does not divide the profits of the Laboratory on the basis of the volume or dollar amount of work referred to the Laboratory by its physicians. HOSPITAL further certifies that the profit-sharing arrangement, if any, among its physicians was established without regard to HOSPITAL's relationship with LABCORP.

20.   RELIANCE UPON FINANCIAL PROJECTIONS
      HOSPITAL agrees that any financial data presented prior to the execution of this Agreement were merely hypothetical models based on data provided to LABCORP by HOSPITAL and shall not be construed as representation or guarantees of future financial returns to the other party.

21.   AUTHORITY
      HOSPITAL and LABCORP each warrant that the execution and performance of this Agreement by it has been authorized by all applicable laws and regulations and all necessary corporate action, and that this agreement constitutes the valid and binding obligation of it in accordance with its terms.

22.   AMENDMENTS
      Any amendments to this Agreement will be effective only if contained in writing and signed by HOSPITAL and LABCORP.

23.   NOTICES                                                                                                                     7

All notices permitted or required by this Agreement will be deemed given when in writing and delivered personally, or deposited in, the United States mail postage prepaid, return receipt requested, addressed to the other party at the address set forth in this Agreement and such other address as the parties from time to time may designate in writing.

Notices shall be directed to LABCORP at:

Laboratory Corporation of America Holdings
430 South Spring Street
Burlington, North Carolina 27215
Attention: Contracts Administrator

with a copy to:
Laboratory Corporation of America Holdings
531 South Spring Street – 2nd Floor
Burlington, North Carolina 27215
Attention: Law Department

and to HOSPITAL at:
Morehead Memorial Hospital
117 East Kings Hwy
Eden, North Carolina 27288
Attention: Ken Boggs, Chief Financial Officer

24. **ASSIGNABILITY**
Neither HOSPITAL nor LABCORP may assign this Agreement without prior written consent of the other party, which consent shall not be unreasonably withheld. A reorganization or transfer of stock shall not constitute an assignment.

25. **SEVERABILITY**
In the event any part of this Agreement is declared invalid, such invalidity will not affect the validity of the remainder.

26. **BUSINESS ASSOCIATE**
The parties agree that pursuant to the duties set forth in this Agreement, LABCORP will provide certain services to, for, or on behalf of HOSPITAL involving the use or disclosure of Protected Health Information ("PHI"), as that term is defined by the Health Insurance Portability and Accountability Act ("HIPAA"). As such the parties agree to execute the attached Business Associate Addendum, incorporated herein by reference.

27. **CHANGE IN LAW**
The terms of this Agreement are intended to be in compliance with all federal, state and local statutes, regulations and ordinances applicable on the date the Agreement takes effect. Should either party reasonably conclude that any portion of this Agreement is or may be in violation of any legal requirements or subsequent enactments by federal, state or local authorities or if any such change or proposed change would materially alter the amount or method of compensating LABCORP for Services performed for HOSPITAL under this Agreement or would materially increase the cost of LABCORP's performance hereunder, the parties agree if reasonable given the nature and content of the specific change in law, to attempt to negotiate written modifications to this Agreement as may be necessary to establish compliance with such authorities or to reflect applicable changes. In the event that such modifications in conformance with legal requirements would contravene an essential assumption upon which the Agreement is premised, or such conforming changes are not in fact, negotiated within thirty (30) days, either party may terminate this Agreement immediately upon written notice to the other party.

28. **NO PRESUMPTION AGAINST DRAFTING PARTY**
The parties acknowledge that this Agreement and the provisions contained herein are, and were, the product of the parties equally, and that it shall not be construed or interpreted for or against any party hereto because said party drafted, or caused its legal representative to draft, any portion of its provisions.

29. **COLLECTIVE BARGAINING**
HOSPITAL warrants and represents that it does not have any collective bargaining or other agreement with any labor union or similar employee group and no union has been certified as a bargaining agent for any of its employees.

30. **BENEFIT**
This Agreement is intended to inure only to the benefit of LABCORP and HOSPITAL. This Agreement is not intended to create, nor shall be deemed or construed to create, any rights in any third parties.

31. **GOVERNING LAW**
This Agreement will be construed in accordance with the laws of the state of North Carolina.

32. **CONFIDENTIALITY**
During the course of this Agreement and any renewals thereof, HOSPITAL and LABCORP have access to certain confidential and proprietary business or medical information about the other, including information concerning: physicians, patients and staff, practice patterns, medical services, fees, billing, finances, management systems, business plans or prospects and employee

8

relations ("Confidential Information"). Each party agree that both during the Initial Term, and any Additional Terms, of this Agreement and for a period of two (2) years after the expiration or termination of this Agreement for whatever reason, the receiving party and its employees and agents shall hold all such Confidential Information in the strictest confidence, and shall not disclose, display, transfer, sell, publish, or otherwise make available to any other person or entity any such Confidential Information, without the prior written consent of the disclosing party, except as may be specifically required by law. The receiving party (and its employees and agents) shall protect such Confidential Information in a manner consistent with the usual manner in which the most confidential business and professional information is protected.

The parties agree that all Confidential Information regarding the other party and including all Confidential Information obtained from the other party's personnel or from any visit to the other party's facilities, is and shall remain Confidential Information and the property of the disclosing party, except for any of such information which:

   (i)     was known to the receiving party prior to its disclosure hereunder;
   (ii)    is disclosed to the receiving party by a third person who is not known to be subject to a confidentiality obligation;
   (iii)   is or hereafter becomes a part of the public domain through no fault of the receiving party or the receiving party's personnel; or
   (iv)    was independently developed by the receiving party.

33.    **ENTIRE AGREEMENT**
This instrument is intended by the parties as a final expression of their agreement and as a complete statement of the terms thereof, and shall supersede all previous understandings and agreements. The parties shall not be bound by any representation, promise, or inducement made by either party or agent of either party that is not set forth in this Agreement. If the terms or conditions contained in any exhibit or attachment to this Agreement or any document incorporated by reference is in conflict with the terms and conditions set forth in the body of this Agreement, the terms and conditions in this Agreement shall control. Any applicable provisions required by federal, state, or local law are hereby incorporated by reference.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in their names as their official acts by their respective representatives, each of whom is duly authorized to execute the same.

Laboratory Corporation of America Holdings ("LABCORP")

By: _____

Printed Name/Title: __Brian Wilcox /AVP__

Date: __12/23/15__

Morehead Memorial Hospital ("HOSPITAL")

By: _____

Printed Name/Title: __Dana M. Weston__

Date: __12/23/2015__

9

<u>Attachment A</u>
<u>Initial Start Up Costs</u>

$      30,000
(Includes labor, supplies and other tangible as well as intangible expenses)

Attachment B
Fees

HOSPITAL agrees to compensate LABCORP for services provided pursuant to the Agreement as follows:

| | | |
|---|---|---|
| Monthly Management Fee | $19,541 | per month |
| Laboratory Testing Fee | $3.94 | per test performed at Laboratory |
| Monthly Reagent Rental Buyout Fee | $2,610 | per month |

For the purposes of this Agreement, a Test shall be defined as a billable CPT Code (excluding panels) and HOSPITAL shall utilize the _____ report to generate the monthly test count.

11

Attachment C
**Standards of Service**
**Hospital Laboratory**

| CURRENT MEASURES | OPERATIONAL DEFINITION | ACCEPTABLE PERFORMANCE |
|---|---|---|
| **1.  Specimen Collection Time**<br><br>Incidences related to excess time elapsed from time of order or scheduled time of collection to actual time of specimen collection. | Identification and trend analysis of complaints and/or errors via Laboratory Quality Assurance Reports on a quarterly basis.<br><br>Excess time elapsed is identified by exception from the Laboratory Quality Assurance Reports. Results are reported as a percentage as follows:<br><br>(# of Occurrences/Billable Tests) * 100= % Specimen Collection Time Complaints or Errors | < = 0.05 % Quarterly Report |
| **2.  STAT Specimens**<br>Percentage of STAT and "Waiting" laboratory tests reported within the acceptable analytic timeframe.<br><br>Analytic time represents the time from specimen receipt in the laboratory to the time the result is reported. Results are printed to the appropriate printer as soon as they are accepted as correct (certified) in the laboratory.<br><br>"STAT" tests are limited to those required for an acutely ill patient where the result would clearly and significantly influence immediate patient management. The result is considered mandatory within a one- (1) hour period from the time received in the Laboratory.<br><br>"Waiting" (Patients waiting for results) tests are treated as second priority – to be handled after STATS, but ahead of routine tests or tests requiring any sort of special handling. | (1)  STAT lab results in <=60 minutes. Percentage, based on a monthly ten-day sample, is calculated using the LIS QA software:<br><br>(#<=60 Minutes/Total Number) *100 = % STATS completed in Less than or Equal to 30 Minutes.<br><br>(2)  "Waiting" lab results in <=90 minutes. Percentage, based on a monthly sample, is calculated using the LIS QA software :<br><br>(#<=90 minutes/Total Number) *100 = % "Waiting" completed in Less Than or Equal to 60 Minutes | (1)  > = 95% in < = 60 Minutes<br><br><br><br><br><br>(2)  > = 95% in < = 90 Minutes<br><br><br>Quarterly Reports |

12

| *CURRENT MEASURES* | *OPERATIONAL DEFINITION* | *ACCEPTABLE PERFORMANCE* |
|---|---|---|
| 3.  Blood Culture Contamination Rate<br><br>Blood cultures with potential contaminants – those cultures in which only one bottle turns positive with the resulting growth of coagulase negative staphylococci, diphtheroids, or propionibacterium. | Analysis of blood culture results (excluding cord bloods, line draws, and single draws) via LIS "Culture Results Summary" screen prints on a quarterly basis.<br><br>The blood culture contamination rate is calculated as follows:<br>(# Contaminated Blood Cultures / Total # Blood Cultures Drawn) * 100 = Blood Culture Contamination Rate | < = 3.0% Quarterly Report |
| 4. Specimen Procurement / Accessioning Errors<br>Documented incidences related to:<br>• Specimen procurement and processing errors<br>• Ordering/registration errors<br>• Receipt and accessioning errors<br><br>Accessioning is the process of assigning a unique number to each laboratory sample or order. | Identification and trend analysis of errors via Laboratory Quality Assurance Reports on a quarterly basis.<br><br>Specimen Procurement/ Accessioning error calculation as a percent of billable tests.<br><br>(#Occurrences/#Tests) *100 = %<br>Specimen Procurement / Accessioning Errors | <=.15% - Quarterly Report |
| 5.  Rejected and Misidentified Specimens<br>Number of occurrences of rejected and misidentified specimens:<br><br>• Quantity not sufficient for testing<br>• Hemolysis<br>• Incorrect Specimen submitted<br>• Specimen clotted<br>• Specimen integrity compromised<br>• Specimen misidentified | Tabulation and trend analysis of rejected specimens as identified by LIS screen prints (with appropriate rejection comment) and misidentified specimen log on a quarterly basis.<br><br># Rejected and/or misidentified specimen calculation expressed as a percent of total accessions:<br><br>(# Rejected and/or misidentified specimens/total accessions) *100 - % Rejected and./or misidentified specimens<br><br>An Accession is a unique assignment of a number of each laboratory sample or order. | < = 1.0% - Quarterly Report |
| 6.  Corrected Laboratory Reports<br><br>Number of documented reporting errors (corrected lab reports). | Corrected lab reports expressed as a percent of total tests performed.  The percentage is calculating using the Laboratory Quality Assurance Reports, LIS amended report log on a quarterly basis.<br><br>(Number Corrected Reports/# Tests)<br>*100% = % Corrected Reports | <=.10% - Quarterly Report |
| 7.  "Other" Occurrence Reports | Examples of occurrences include instrument malfunction, unacceptable quality control, and inconsistent test results | |

13

| (unrelated to procurement/ accessioning errors or result reporting errors)<br><br>Number and classification of occurrence report NOT related to procurement /accessioning errors or result report errors | reported via the Laboratory Quality Assurance Reports. Results are expressed as a percent of total tests performed on a quarterly basis<br><br>(# of "Other" Occurrences/#Tests)<br>*100 = % "Other" Occurrences | |
|---|---|---|
| 8. Accreditations/Licensure | | Maintains CLIA and/or CAP or Joint Commission Standards applicable to the laboratory. |
| 9. Routine Test Turnaround Time | | > 95% in 24 hours |
| 10. Reference Laboratory Test Turnaround Time | | > 95% within the established timeframe |
| 11. Safe Work Environment | Maintain OSHA Standards and other local, state, or federal regulations applicable to the laboratory. | Annual Safety Training Annual Blood Borne Exposure Training Annual Chemical Hygiene Training |
| 12. Ongoing Laboratory Performance Review Committee Meetings | Group made up of appropriate LabCorp personnel and Hospital's staff to include Administration, MD's, and Director of Nursing. | Meeting to be held quarterly or as needed. |
| 13. Employee Performance Evaluations | | Employee Performance Evaluations will be conducted on an Annual Basis |

14

Attachment D
Equipment List

*LABCORP PROPOSED EQUIPMENT*

| TYPE OF EQUIPMENT | MODEL | QUANTITY |
|---|---|---|
| Roche | Cobas 6000 | 2 |
| Evoqua | Medica 60 | 2 |
| Sysmex | XN 2000 | 1 |
| Siemens | Clinitek Atlas | 1 |
| J&J Healthcare | MTS Gel Workstation | 1 |
| Sysmex | CA-620 | 1 |
| | | |
| | | |
| | | |

*HOSPITAL EXISTING EQUIPMENT*

| TYPE OF EQUIPMENT | MODEL | QUANTITY |
|---|---|---|
| bioMerieux | BacTAlert | 1 |
| bioMerieux | Vitek Jr. | 1 |
| Stago | Compact | 2 |
| Polymedco | Sedimat 15 | 1 |
| Siemens | Hematek | 1 |
| Siemens | Clinitek Advantus | 1 |
| | | |
| | | |

*Please note:  LABCORP reserves the right to substitute and/or replace equipment as necessary.*

15

**Attachment E**
**General Duties of Laboratory Medical Director**

The general duties of the Laboratory Medical Director include those required by CLIA, including:

1. Review and evaluate all Quality Controls on a regular and timely basis.

2. Establish and assist in the monitoring of Laboratory Quality Assurance programs.

3. Monitor all proficiency testing programs on a regular and timely basis.

4. Provide interpretation of all clinical tests as needed or requested.

5. Provide clinical consultations as requested by the medical staff.

6. Assist in the selection and approval of all Laboratory procedures.

7. Participate in the interview/approval process for Laboratory technical staff.

8. Act as the Laboratory liaison to the medical staff and attend appropriate Medical Staff/Board meetings as required and appropriate.

9. Assist LABCORP in the management of the Laboratory in a manner which shall not interfere with LABCORP's management of the Laboratory, except as required by law or by each HOSPITAL's bylaws, policies, rules and regulations.

16

**Attachment F**
Testing Performed at Laboratory

| Core Lab | | | |
|---|---|---|---|
| Test Name | Test Name | Test Name | Test Name |
| CBC AUTO DIFF | ACETAMINOPHEN | FLUID PROTEIN | 24HR UR URIC AC |
| COMP METABOLIC | SALICYLATES | LYTES,BUN,CRE | |
| BASIC METABOLIC | HEPARIN ANTI-Xa | AST (SGOT) | |
| TROPONIN | PLASMA AMMONIA | CALCIUM | |
| CBC NO DIFF | RAPID DRUG SCR. | FLUID GLUCOSE | |
| URIN MICRO | RETIC COUNT | LH | |
| PRO TIME | UR TP/CRE RATIO | TRIGLYCERIDES | |
| CPK PROFILE | CBC/DIFF | SPOT CREATININE | |
| APTT | SERUM PREGNANCY | FLUID LDH | |
| TSH | TOTAL CPK | FLUID CRYSTALS | |
| BNP | MONO TEST | SPOT POTASSIUM | |
| DRUG SCREEN | CBC NEWBORN | CSF COUNT | |
| UA W/O MICRO | AMNISURE ROM | CSF GLUCOSE | |
| LIPID PROFILE | POTASSIUM | CSF PROTEIN | |
| LIPASE | DILANTIN | PEAK GENTAMICIN | |
| HEMOGLOBIN A1c | FREE T4 | SYNOVIAL FL CT | |
| URINE PREGNANCY | VALPROIC ACID | SPOT U CHLORIDE | |
| AMYLASE | CLINITEST | SODIUM | |
| D-DIMER QN | PLATELET COUNT | TROUGH GENT | |
| MAGNESIUM | MANUAL DIFF. | FLUID ALBUMIN | |
| MORPHOLOGY | 2 HR UR AMYLASE | VANCOMYCIN PEAK | |
| DIFF NO CHARGE | ELECTROLYTES | HEPATIC,LDH,GGT | |
| HEPATIC PROFILE | HIVSCREEN | 24 HR URINE CRE | |
| CRE+eGFR | DIGOXIN | FLUID AMYLASE | |
| HEMOGLOBIN | 3HR GLUCOSE TOL | FLUID URIC ACID | |
| HEMATOCRIT | SICKLE CELL | ACETONE | |
| CHEM PROFILE | FIBRINOGEN | ALK PHOS | |
| LACTATE, PLASMA | SER. OSMOLALITY | SPOT UR UREA NI | |
| IRON + TIBC | ALT (SGPT) | CHOLESTEROL | |
| GLUCOSE | FFN | 24 HR UR SODIUM | |
| VANCOMYCIN TROU | SPOT SODIUM | URINE PH | |
| PHOSPHORUS | CARBAMAZEPINE | SPOT CALCIUM | |
| BLOOD ALCOHOL | FLUID COUNT | SPOT URINE PHOS | |
| SED RATE | CREAT CLEARANCE | SPOT PROTEIN | |
| URINALYSIS | LITHIUM | SPOT UR AMY | |
| TOTAL BILIRUBIN | CBC NO CHARGE | COHB | |
| HCG QUANT | GGT | TOTAL PROTEIN | |
| BUN | 24 HR URINE PRO | CHLORIDE | |
| LDH | SCDS | 24 HR URINE CAL | |
| URIC ACID | PHENOBARBITAL | 24 HR CHLORIDE | |
| 1 HR GLUCOSE | IRON | WBC | |
| CORD BLOOD PH | MICROALBUMIN UR | CARBON DIOXIDE | |

17

| DIR BILIRUBIN | INDIRECT BILI | 24HR URINE PHOS |
|---|---|---|
| RENAL PANEL | ALBUMIN | KETONE |

| Microbiology |
|---|
| BLD CULT PROC |
| INFLUENZA A + B |
| STREP GROUP A |
| WET PREP |
| C.DIFF(Toxin Screen) |
| RSV |
| FECAL OCCBLD 1 |
| GS |
| FECAL OCCBLD 2 |
| CLO |
| FECAL OCCBLD 3 |
| H.PYLORI AG |
| CAMPY STOOL AG |
| KOH PREP |
| GASTROCCULT |
| STENOTROPH CHRG |

| Blood Bank |
|---|
| ABO/RH |
| DONOR TYPE |
| TAH |
| CROSSMATCH |
| ABS |
| DAT |
| FETALSCREEN |
| CROSSMATCH IGG |
| AB ID CHARGE |
| AG TYPE/UNIT |
| TFRX WORKUP |
| XM INC(37) |
| AG RBC EACH |
| ANTIGEN ID |

18

## Attachment G
### Equipment Reagent Rental Obligations

The equipment reagent rental or rental obligation for each piece of equipment is set forth in the attached.

Beckman Coulter DXc660i:  Attachment G-1

Beckman Coulter DH800:  Attachment G-2

Remisol Advance Application Server:  Attachment G-3

19

<u>**Attachment G-1**</u>
Beckman Coulter DXc660i, DxC 600 Pro, and DxI 600

Equipment:  Beckman Coulter DXc660i, DxC 600 Pro, and DxI 600

Acquisition Option:  Reagent Rental

Part No.:  DxC 660i – 786/800694/5161; DxC 600 Pro – 5291; DxI 600 – 900522

Quantity:  1 each of the three instrument models noted above

Agreement Number:  39889US – Morehead Memorial Hospital

Original Agreement Date:  1/6/11

Date of Buy Out:  12/31/15

Total Amount of Buy Out:          $21,674.09

Amount paid by LABCORP:         $21,674.09

Amortization period in months to calculate payment for early termination pursuant to Section 1C is 60.

Please note:  The total buy out amount indicated above will include the full amount of the obligation, including but not limited to expenses associated with equipment rental, consumables and service charges.  This amount will be provided in writing from the vendor as a final notice for the full obligation.

<u>Attachment G-2</u>
Beckman Coulter DH800

Equipment:  Beckman Coulter DH800

Acquisition Option:  Reagent Rental

Part No.:  AU49821, AU49819

Quantity:  2

Agreement Number:  47322US – Morehead Memorial Hospital

Original Agreement Date:  9/29/12

Date of Buy Out:  12/31/15

Total Amount of Buy Out:          $101,411.47

Amount paid by LABCORP:          $101,411.47

Amortization period in months to calculate payment for early termination pursuant to Section 1C is 60.

Please note:  The total buy out amount indicated above will include the full amount of the obligation, including but not limited to expenses associated with equipment rental, consumables and service charges.  This amount will be provided in writing from the vendor as a final notice for the full obligation.

**Attachment G-3**
Remisol Advance Application Server

Equipment:  Remisol Advance Application Server

Acquisition Option:  Rental

Part No.:  6DC615J

Quantity:  1

Agreement Number:  40600US – Morehead Memorial Hospital

Original Agreement Date:  10/02/11

Date of Buy Out:  12/31/15

Total Amount of Buy Out:  $5,313.60

Amount paid by LABCORP: $5,313.60

Amortization period in months to calculate payment for early termination pursuant to Section 1C is 60.

Please note:  The total buy out amount indicated above will include the full amount of the obligation, including but not limited to expenses associated with equipment rental, consumables and service charges.  This amount will be provided in writing from the vendor as a final notice for the full obligation.

22

## HIPPA BUSINESS ASSOCIATE ADDENDUM

This Agreement is made effective the 23rd of December, 2015, by and between Morehead Memorial Hospital, hereinafter referred to as "Covered Entity", and Laboratory Corporation of America Holdings, hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

### WITNESSETH:

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information, and the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act (Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5)) modified and amended the Administrative Simplification provisions; and

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Rules"), as further amended by the Omnibus Final Rule (78 Fed. Reg. 5566), (hereinafter, the Administrative Simplification provisions, HITECH, such rules, amendments, and modifications, including any that are subsequently adopted, will be collectively referred to as "HIPAA"); and

WHEREAS, the parties wish to enter into or have entered into an Agreement whereby Business Associate will provide certain services to, for, or on behalf of Covered Entity involving the use or disclosure of Protected Health Information ("PHI") as defined below, and pursuant to such Agreement, Business Associate may be considered a "Business Associate" of Covered Entity as defined below;

WHEREAS, Covered Entity and Business Associate intend to protect the privacy and provide for the security of PHI disclosed to Business Associate pursuant to the Agreement in compliance with the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations (the "HIPAA Rules"), and other applicable laws;

WHEREAS, the purpose of this Addendum is to satisfy certain standards and requirements of the HIPAA Rules as the same may be amended from time to time;

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services and/or products to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined by HIPAA (the agreement evidencing such arrangement is titled Technical Support Agreement, dated December 1, 2015, and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to Protected Health Information in fulfilling its responsibilities under such arrangement; [and

WHEREAS, Covered Entity and Business Associate have previously entered into a Business Associate Agreement dated _____ and now wish to supersede such prior agreement with this Agreement;]

THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with HIPAA, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of HIPAA and to protect the interests of both Parties.

### I.    DEFINITIONS

Except as otherwise defined herein, any and all capitalized terms in this Section shall have the definitions set forth by HIPAA. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of

23

HIPAA, HIPAA shall control. Where provisions of this Agreement are different from those mandated by HIPAA, but are nonetheless permitted by HIPAA, the provisions of this Agreement shall control.

## II.    BUSINESS ASSOCIATE OBLIGATIONS

Business Associate acknowledges and agrees that all Protected Health Information that is created, maintained, transmitted or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate, or Protected Health Information which, on behalf of Covered Entity, is created, maintained, transmitted or received by Business Associate or a Subcontractor, shall be subject to this Agreement.

(a)    Business Associate agrees:

(i)    it is aware of and will comply with all provisions of HIPAA that are directly applicable to business associates;

(ii)    in the event it enters into an agreement with a Subcontractor under which Protected Health Information could or would be disclosed or made available to the Subcontractor, the Business Associate will have in place an appropriate Business Associate Agreement with the Subcontractor before any Protected Health Information is disclosed or made available to the Subcontractor;

(iii)    to use or disclose any Protected Health Information solely as would be permitted by HIPAA if such use or disclosure were made by Covered Entity: (1) for meeting its obligations as set forth in the Arrangement Agreement, or any other agreements between the Parties evidencing their business relationship', or (2) as required by applicable law, rule or regulation, or by accrediting or credentialing organization to whom Covered Entity is required to disclose such information or as otherwise permitted under this Agreement, the Arrangement Agreement (if consistent with this Agreement and HIPAA), or HIPAA. All such uses and disclosures shall be subject to the limits set forth in 45 CFR § 164.514 regarding limited data sets and 45 CFR § 164.502(b) regarding the minimum necessary requirements;

(iv)    at the request of the Secretary, to comply with any investigations and compliance reviews, permit access to information, provide records and compliance reports, and cooperate with any complaints, pursuant to 45 CFR § 160.310;

(v)    at termination of this Agreement, the Arrangement Agreement (or any similar documentation of the business relationship of the Parties), or upon request of Covered Entity, whichever occurs first, if feasible, Business Associate will return or destroy (and attest to the destruction of) all Protected Health Information received from Covered Entity or created or received by Business Associate on behalf of Covered Entity that Business Associate still maintains in any form and retain no copies of such information, or if such return or destruction is not feasible, Business Associate will extend the protections of this Agreement to the information and limit further uses and disclosures to those purposes that make the return or destruction of the information not feasible;

(vi)    to ensure that its Subcontractors to whom it provides Protected Health Information received from Covered Entity or created or received by Business Associate on behalf of Covered Entity, agree to the same (or greater) restrictions and conditions that apply to Business Associate with respect to such information, and agrees to, pursuant to 45 CFR § 164.314, implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic protected health information that it creates, receives, maintains, or transmits on behalf of the Covered Entity and ensure that any Subcontractors to whom it provides such information agrees to implement reasonable and appropriate safeguards to protect it. In addition, Business Associate agrees to take reasonable steps to ensure that its employees' actions or omissions do not cause Business Associate to breach the terms of this Agreement;

(vii)    Business Associate shall, following the discovery of a breach of unsecured Protected Health Information, as defined in HIPAA, notify Covered Entity of such breach pursuant to the terms of 45 CFR § 164.410 and cooperate in Covered Entity's breach analysis procedures, including risk assessment, if requested. A breach shall be treated as discovered by Business Associate as of the first day on which such breach is known to Business Associate or, by exercising reasonable diligence, would have been known to Business Associate. Business Associate will provide such

24

notification to Covered Entity without unreasonable delay and in no event later than 30 calendar days after discovery of the breach. Such notification will contain the elements required in 45 CFR § 164.410. Covered Entity shall determine any required actions with respect to any such breach, and Business Associate shall cooperate with Covered Entity and comply with such actions; and

        (viii)    Business Associate will not directly or indirectly receive remuneration in exchange for any Protected Health Information without a valid authorization from the applicable individual except in compliance with 45 CFR § 164.502(a)(5)(ii). Without written approval of Covered Entity, Business Associate will not engage in any communication which might be deemed to be "marketing" under HIPAA. In addition, Business Associate will, pursuant to HIPAA, comply with all applicable requirements of 45 CFR §§ 164.308, 164.310, 164.312 and 164.316.

        (ix)    to the extent Business Associate is to carry out any of Covered Entity's obligations under 45 CFR Part 164, Subpart E (the privacy standards of HIPAA), to comply with the requirements of Subpart E that apply to Covered Entity in the performance of such obligations.

    (b)    Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

        (i)    if necessary, for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate, provided that as to any such disclosure, the following requirements are met:

            (A)    the disclosure is required by law; or

            (B)    Business Associate obtains satisfactory assurances through a written Business Associate Agreement from the Subcontractor to whom the information is disclosed that it will be held confidentially and used or further disclosed only as required by law or for the purpose for which it was disclosed to the Subcontractor, and the Subcontractor notifies Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached;

        (ii)    for data aggregation services, if to be provided by Business Associate for the health care operations of Covered Entity pursuant to any agreements between the Parties evidencing their business relationship. For purposes of this Agreement, data aggregation services means the combining of Protected Health Information by Business Associate with the Protected Health Information received by Business Associate in its capacity as a business associate of another covered entity, to permit data analyses that relate to the health care operations of the respective covered entities.

    (c)    Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement. Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by HIPAA.

    (d)    The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to the use and disclosure of Protected Health Information to ensure Covered Entity's and Business Associate's compliance with the terms of HIPAA.

    (e)    Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware. Business Associate shall report to Covered Entity any Security Incident of which it becomes aware promptly and in the manner required by Covered Entity to permit compliance with the requirements of HIPAA. In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.    AVAILABILITY OF PHI

Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to 45 CFR § 164.522 to which Covered Entity has agreed and of which Business Associate is

25

notified by Covered Entity. Business Associate agrees to make available Protected Health Information to the extent and in the manner required by 45 CFR § 164.524. If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual. Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of 45 CFR § 164.526. In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by 45 CFR § 164.528. Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.    NOTIFICATION

Business Associates shall provide notification of a direct request from the individual to Covered Entity's Privacy Officer by e-mail at privacyofficer@labcorp.com or by certified mail to:

>            Privacy Officer
>            Laboratory Corporation of America
>            531 South Spring Street
>            Burlington, NC 27215

V.    TERMINATION

Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement. If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement, where practicable, Covered Entity shall give written notice to Business Associate of such belief within a reasonable time after forming such belief. If Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately.

VI.    MISCELLANEOUS

Except as expressly stated herein or in HIPAA, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of North Carolina. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of HIPAA, such Party shall notify the other Party in writing. For a period of up to thirty days, the

26

Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with HIPAA, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

COVERED ENTITY:                                    BUSINESS ASSOCIATE:

Morehead Memorial Hospital                         Laboratory Corporation of America Holdings

By: _____                        By: _____

Title: President + CEO                              Title: AVP

Date: Dec 23, 2015                                  Date: 12/23/15

27

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

IN RE:                                    CASE NO:     17-10775
Morehead Memorial Hospital                CHAPTER      11
    Debtor(s)

## CERTIFICATE OF SERVICE

I, Cindy B. McGhee, a paralegal with Smith Debnam Narron Drake Saintsing & Myers, L.L.P., state under penalty of perjury:

That I am, and at all times hereinafter-mentioned was, more than eighteen (18) years of age; and

That on the 30th day of October, 2017, I served copies of the foregoing upon the following by mailing a copy thereof, postage prepaid:

Morehead Memorial Hospital,  Debtor
117 E. Kings Hwy.
Eden, NC 27288-5201

**VIA CM/ECF:**

Jennifer Barker Lyday
Attorney for Debtor(s)
Waldrep LLP
101 S. Stratford Rd., Ste. 210
Winston-Salem, NC 27104

Francisco T. Morales
Attorney for Debtor(s)
Waldrep LLP
101 S. Stratford Rd., Ste. 210
Winston-Salem, NC 27104

Thomas W. Waldrep, Jr.
Attorney for Debtor(s)
Waldrep LLP
101 S. Stratford Rd., Ste. 210
Winston-Salem, NC 27104

**VIA CM/ECF:**

Terri L. Gardner
Attorney for Official Committee of Unsecured Creditors for Morehead Memorial Hospital
Nelson Mullins Riley & Scarborough, LLP
P O Box 30519
Raleigh, NC 27622

Boris I. Mankovetskiy
Attorney for Official Committee of Unsecured Creditors for Morehead Memorial Hospital
Sills Cummins & Gross, P.C.
One Riverfront Plaza
Newark, NJ 07102

Andrew Howard Sherman
Attorney for Official Committee of Unsecured Creditors for Morehead Memorial Hospital
Sills Cummins & Gross, P.C.
One Riverfront Plaza
Newark, NJ 07102

This the 30th day of October, 2017.

/s/ Cindy B.  McGhee
Cindy B. McGhee, Paralegal

\*\*\*    This communication is from a debt collector.  The purpose of this communication is to collect a debt.